# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### CASE NO.: 1:22-cv-294

**HARSHARAN KAUR SINGH, M.D. and
VOLKER REINHOLD AUGUST
NICKELEIT, M.D.,**

                        **Plaintiffs,**

        v.

**UNIVERSITY OF NORTH CAROLINA AT
CHAPEL HILL; UNIVERSITY OF NORTH
CAROLINA HEALTH CARE SYSTEM,
(d/b/a UNC HEALTH CARE); UNIVERSITY
OF NORTH CAROLINA SCHOOL OF
MEDICINE; JANET HADAR, MSN, in her
official capacity; THOMAS S. IVESTER,
M.D., individually and in his official capacity;
RUSSELL BROADDUS M.D.; individually
and in his official capacity, LISA VOSS,
individually and in her official capacity;
DEREK V. HOAR, individually and in his
official capacity; and HARVEY L.
LINEBERRY, PhD., individually and in his
official capacity,**

                        **Defendants.**

**COMPLAINT**

**JURY TRIAL DEMANDED**

PLAINTIFFS, HARSHARAN KAUR SINGH, M.D. and VOLKER REINHOLD

AUGUST NICKELEIT, M.D., by their attorneys NESENOFF & MILTENBERG LLP and

PARRY LAW, PLLC as and for their Complaint[1] against Defendants, respectfully alleges

---

[1]For purposes of seeking immediate relief and to avoid further irreparable harm, Plaintiffs offer the instant pleading, sufficiently stating a cause of action for due process violations under 42 U.S.C. § 1983. The Complaint fully supports Plaintiffs' relief for a Temporary and Permanent Injunction to redress and prevent further irreparable harm. Plaintiffs will seek to amend their Complaint at the appropriate time, to add

1

as follows:

<u>**THE NATURE OF THIS ACTION**</u>

1.      This constitutional due process lawsuit (42 U.S.C. § 1983) is brought on behalf of Plaintiffs HARSHARAN KAUR SINGH, M.D. ("Dr. Singh") and VOLKER REINHOLD AUGUST NICKELEIT, M.D. ("Dr. Nickeleit," and collectively with Dr. Singh, "Plaintiffs"), who stand before this Honorable Court improperly and unconstitutionally stripped of their ability to practice medicine at the facility they have called home for over twenty (20) years, without receiving adequate notice of the allegations that Defendants claim justify the adverse action or any meaningful opportunity to dispute those allegations.

2.      The malicious actions by the Defendants gained traction during Defendant Russell M. Broaddus, M.D.'s ("Defendant Broaddus"), rise to Chair of Pathology and Laboratory Medicine at the University of North Carolina School of Medicine in September 2019. Prior to retiring his position, the former Chair of the Department, Dr. J. Charles Jennette, M.D. ("Dr. Jennette"), told Plaintiffs that their careers were in danger and that after he retires, he would no longer be in a position to "protect them."

3.      Defendants, based entirely on anonymous and still undisclosed sources, informed Plaintiffs that UNC Hospital/SOM's Human Resources Department ("HR"), was commencing an investigation because the "UNC Hospital/UNC School of Medicine

<hr>

numerous other individual defendants and various additional causes of action.

2

received complaints of disruptive and inappropriate behavior in the workplace." As a result of this "investigation," the Plaintiffs have been subjected to unwarranted disciplinary action, without a hearing.

4. Defendant Broaddus openly told the Plaintiffs to resign from their faculty positions and seek employment elsewhere. Defendants, unhappy with Plaintiffs' choice to remain employed with the University of North Carolina Health Care System (encompassing UNC Hospital and School of Medicine, and hereinafter referred to as "UNC Hospital/SOM"), used the HR investigation report and conspired to strip Plaintiffs of their privileges to practice medicine at UNC Hospital/SOM, and of their rights, benefits and compensation as physicians and tenured Professors.

5. Defendants were never provided with the identities of the complainants, the specific allegations, or the timeframe of the complaints.[2] The sources referenced in the HR complaints have never been revealed to Plaintiffs despite their repeated requests.

6. The unsupported accusations contained in the HR report resulted in the revocation of Plaintiffs' privileges, without due process, under the false pretense of "immediate threat to health or safety."

7. Interestingly, the HR report relied upon to unlawfully divest Plaintiffs of their property and liberty rights under the guise of "inappropriate and disruptive behavior",

_____

[2]During the past six months, Plaintiffs obtained copies of all of their personnel files across UNC, including Department of Pathology, SOM, Provost office, and HR, and their files do not contain a single documented complaint, allegation or notation of any alleged misconduct.

failed to provide any mention of conduct which would cause any concern for patient care, health or safety. To the contrary, the HR report contained numerous glowing and complementary accolades of the Plaintiffs and their skills as physicians and researchers.

8.　　In their over forty (40) years of combined service at UNC Hospital/SOM, Plaintiffs have never been subjected to *any* disciplinary actions or Morbidity and Mortality inquiries (better known as a M&M conference[3]). They had never been previously formally accused of "failure to get along" with co-workers or more importantly, for conduct negatively affecting patient care, health or safety.

9.　　Plaintiffs were subject to disciplinary sanctions and a loss of their privileges to practice medicine at UNC Hospital/SOM, in violation of their due process rights.

10.　　As a result of Defendants' individual and wrongful conduct, Plaintiffs have suffered, among other things, a loss of their privileges to practice medicine at UNC Hospital/SOM, said revocation of privileges being forwarded to the National Practitioner Data Bank, demotions, drastic reduction in salaries, loss of incentive pay and loss of insurance benefits.　Through their actions, Defendants have made it impossible for

---

[3]UNC's Anatomic Pathology's requirements, lasted edited February 15, 2022, states any case involving the anatomic pathology department or its associated laboratories (within the McClendon Clinical Laboratories), with one or more of the following adverse events should be presented and discussed at Anatomic Pathology M&M: -Wrong diagnosis - A pathology diagnosis rendered at UNC Hospital/SOM was incorrect; - Diagnostic delay - An unusual delay in a pathology diagnosis has occurred;- Frozen discrepancy - A discrepancy between frozen section diagnosis and final diagnosis resulted in real or potential adverse impact on clinical outcome or intraoperative management; -Outside diagnosis discrepancy – A discrepancy between the outside diagnosis and the UNC Hospital/SOM pathologist's second opinion diagnosis that results in a significantly altered treatment approach (for patients that are receiving care at UNC Hospital/SOM based on a primary pathology diagnosis that was made outside of UNC Hospital/SOM and is officially reviewed here prior to treatment); and -A significant "near miss" of any of the above.

4

Plaintiffs to continue practicing medicine at UNC Hospital/SOM, accomplishing and furthering their conspiracy to force their ouster without just cause or due process protections.

11.     Accordingly, Plaintiffs bring this action for violations of 42 U.S.C § 1983 (Denial of Fourteenth Amendment Due Process), seeking prospective injunctive relief, against Defendants, along with compensatory and punitive damages against Defendants Ivester, Broaddus, Voss, Hoar and Lineberry in their individual capacities. Plaintiffs further seek immediate reinstatement pending a final decision in this action.[4]

## THE PARTIES

12.     Harsharan Singh, M.D. ("Dr. Singh"), is a natural person residing in the State of North Carolina.  During the events described herein, Dr. Singh was employed as a tenured Professor of Pathology. Until Feb 2, 2022, she served as the Associate Director of the Division of Nephropathology and Director of Electron Microscopy Services at UNC Hospital. On March 8, 2022, her professional status was changed from "Professor with Clinical Privileges" to 'Research Professor' at UNC-SOM. Dr. Singh has been entirely stripped of privileges to practice medicine at the UNC Hospital/SOM.

13.     Volker Nickeleit, M.D. ("Dr. Nickeleit") is a natural person residing in the State of North Carolina. During the events described herein, Dr. Nickeleit, was employed

---

[4]A motion for temporary restraining order ("TRO") seeking immediate reinstatement to prevent further irreparable harm accompanies this Complaint.

5

as a tenured Professor of Pathology. Until Feb 2, 2022, he held the positions of Director of the Division of Nephropathology, Director of the Fellowship Training Program in Nephropathology and until February 28, 2022, served as Adjunct Professor of Medicine at UNC Hospitals and UNC Hospital/SOM. As of March 8, 2022, his professional status changed from "Professor with Clinical Privileges" to "Research Professor" at UNC-SOM. Dr. Nickeleit has been entirely stripped of privileges to practice medicine at UNC Hospital/SOM.

14.     At all relevant and material times Defendant, The University of North Carolina at Chapel Hill ("UNC-CH") has been and is a body politic and corporation, having the capacity to be sued, pursuant to N.C. Gen. Stat. 116-204(7). Pursuant to N.C. Gen. Stat. 116-4, UNC is comprised of constituent institutions of higher education, including the University of North Carolina School of Medicine ("UNC-SOM"), thus all knowledge, acts and omissions to act alleged herein as attributable to UNC-SOM and its administrative officers are alleged to have been the knowledge, acts and omission to act of UNC. UNC and the UNC-SOM have their principal place of business in Chapel Hill, Orange County, North Carolina.

15.     Defendant University of North Carolina Health Care System ("UNC Hospital/SOM") is an integrated health care system owned by the state of North Carolina and "governed and administered as an affiliate enterprise of The University of North Carolina," N.C.G.S. § 116-37. It currently consists of UNC Hospitals and its provider

6

network, the clinical program of the UNC School of Medicine and eleven affiliate hospitals and hospital systems across the state. UNC Health's principal place of business is in Chapel Hill, Orange County, North Carolina.

16.     UNC and UNC Hospital/SOM are collectively referred to herein as "the UNC Entities."

17.     Defendant Janet Hadar, MSN, ("Defendant Hadar") is the current President of UNC Hospitals.  Defendant Hadar may be contacted at UNC Hospitals at 101 Manning Drive Med Wing E, 3rd Floor Chapel Hill, NC 27514. Defendant Hadar is joined solely in her official capacity for the purpose of seeking prospective relief.

18.     Defendant Thomas S. Ivester, M.D. ("Defendant Ivester") is Vice President of Medical Affairs and Chief Medical Officer at UNC Hospitals.  Defendant Ivester can be contacted at UNC Hospitals, 101 Manning Drive Med Wing E, 3rd Floor Chapel Hill, NC 27514. Defendant Ivester is joined in his individual and official capacity.

19.     Defendant Russell Broaddus, M.D. ("Defendant Broaddus") is Chair of the Department of Pathology and Laboratory Medicine at UNC Hospital/SOM. Defendant Broaddus can be contacted at UNC Hospitals Campus Box #7525, Brinkhous-Bullitt Building, Chapel Hill, NC 27599-7525101.  Defendant Broaddus is joined in his individual and official capacity.

20.     Defendant Lisa Voss ("Defendant Voss") is a Senior Employee Relations Consultant at UNC-SOM.  Defendant Voss may be contacted at 145 Medical Drive,

Campus Box# 9520, Chapel Hill, NC 27599. Defendant Voss is joined individually and in her official capacity.

21.     Defendant Derek V. Hoar ("Defendant Hoar") is a Senior Employee Relations Consultant at UNC-SOM. Defendant Hoar may be contacted at 145 Medical Drive, Campus Box# 9520, Chapel Hill, NC 27599. Defendant Hoar is joined individually and in his official capacity.

22.     Defendant Harvey Lineberry, PhD. ("Defendant Lineberry") is Associate Dean of Human Resources at UNC-SOM.  Defendant Lineberry may be contacted at 145 Medical Drive, Campus Box# 9520, Chapel Hill, NC 27599.  Defendant Lineberry is joined individually and in his official capacity.

<u>**JURISDICTION AND VENUE**</u>

23.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because the claims arise under the Constitution and statutes of the United States.

24.     This Court has personal jurisdiction over The UNC Entities on the ground that the UNC Entities are conducting business within the State of North Carolina.

25.     This Court has personal jurisdiction over the Individual Defendants as they all reside in the State of North Carolina and/or their wrongful and unlawful actions, individually and collectively, took place in the Middle District of North Carolina.

26.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred

in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

I.   **Plaintiffs' Backgrounds**

    a.   **Dr. Singh**

27.   Dr. Singh is licensed to practice medicine in the State of North Carolina since 1989. She is also licensed to practice medicine in Virginia, South Carolina, Florida and Tennessee. She is Board Certified in Anatomic and Clinical Pathology and has a Subspecialty Certification in Cytopathology[5].

28.   In or around 1985, Dr. Singh graduated from East Carolina University Brody School of Medicine with honors (part of the University of North Carolina system).

29.   Following her graduation, Dr. Singh completed her residencies at the esteemed Tufts University, Virginia Commonwealth University and Duke University in Internal Medicine and Anesthesiology before embarking on a career path in Anatomic and Clinical Pathology. She was then accepted into and participated in a fellowship program under Dr. J. Charles Jennette ("Dr. Jennette") at UNC Hospital/SOM where she performed subspecialty training in Nephropathology. She remained employed as a Nephropathologist with UNC Hospital/SOM for over 20 years.

30.   In or about January 2001, Dr. Singh became an Associate Professor of Pathology and Laboratory Medicine, Director of Electron Microscopy Services for UNC

---

[5] There is no subspecialty board certification in Nephropathology by the American Board of Pathology.

9

Hospital/SOM and Medical Director of the School of Cytotechnology. Her service duties were concentrated initially in surgical pathology and cytopathology with only a minor role in Nephropathology. She joined the Division of Nephropathology full time in 2006 as the Associate Director and currently (until March 8, 2022) serves as the Director of Electron Microscopy Services for UNC Hospital/SOM. Dr. Singh was granted permanent tenure in 2005 and a Full Professorship in 2011.

31. Dr. Singh has published over 150 abstracts, articles and book chapters, and has given numerous presentations nationally and internationally. She also served on editorial boards and as reviewer for multiple professional journals.

32. Prior to 2022, Dr. Singh had never been the subject of any disciplinary proceedings or reprimanded for any negative conduct or behavior. All of her reviews, her annual faculty reviews and post-tenure reviews at UNC Hospital/SOM, including her last review in late 2021, were always excellent. Dr. Singh's professional work was never called into question and was in fact the subject of praise.

**b.** **Dr. Nickeleit**

33. Dr. Nickeleit is licensed to practice medicine in the State of North Carolina since 2000. He is also licensed to practice Medicine in Georgia, South Carolina and Tennessee. He is Board Certified in Anatomic Pathology since 1993.

34. Dr. Nickeleit graduated (with honors) from the Christian-Albrechts Universitaet in Kiel, Germany in 1985, with a medical degree, the German equivalent of

10

an MD degree known in the US system.

35.     Following his graduation, he trained as a resident and research fellow at The University of Basel in Switzerland, Stanford University in Palo Alto, CA and Harvard Medical School/Massachusetts General Hospital in Boston, MA, where he graduated in Anatomic Pathology.

36.     Dr. Nickeleit was subsequently accepted as a junior faculty/instructor at the Massachusetts General Hospital, where he received further subspecialty training in Nephropathology under Drs R.B. Colvin and R.T. McCluskey. Under their mentorship, he published in highly ranked journals including the 'New England Journal of Medicine'.

37.     Dr. Nickeleit returned to the University of Basel in Switzerland where he served as a nephropathologist until February 2001. In 2001, he was bestowed with the "habilitation" at the University of Basel, Switzerland which is a similar academic achievement and degree to Senior Lectureships in the U.K. system. During that time, he was actively recruited by Dr. Jennette to join the faculty at UNC Hospital/SOM as an 'Associate Professor' and serve as the Associate Director of the Nephropathology Division and the Director of the Nephropathology Fellowship Training Program.

38.     Dr. Nickeleit has been employed as a Nephropathologist with UNC Hospital/SOM for over 20 years.  He was awarded tenure in 2005, became Director of the UNC Hospital Division of Nephropatholgy in 2007 and was made a full Professor in the UNC system in 2008.  He has published over 150 articles and book chapters, has given

11

numerous presentations nationally and internationally and has served on editorial boards and as reviewer for many professional journals.

39.     Dr. Nickeleit's 20-year personnel record at UNC Hospital/SOM was exemplary until the recent spate of unsupported anonymous allegations. He was called an "exemplary role model for peers, junior faculty, and trainees" by the UNC-SOM Post Tenure Review Committee in May of 2018.

40.     In March of 2018, he was bestowed with the prestigious "Jacob Churg Award" by the "Renal Pathology Society". Dr Jennette, former chair of the UNC Hospital/SOM Department of Pathology stated in his official congratulation note in March 2018: "This is the most prestigious annual award made by the international Renal Pathology Society. It recognizes sustained excellence in renal pathology research, education and clinical service. Volker has made many impactful contributions to the field, but he is most widely recognized for his research and scholarship related to kidney transplantation."

41.     From 2013 through 2020, Dr. Nickeleit was listed as one of the "Best Doctors in America" (a list of physicians who have been selected by their peers).

42.     In January 2021 "UNC-Chapel Hill" celebrated Dr. Nickeleit for 20 years of service. The UNC notification was sent as "…a marker of appreciation…. and the gratitude we all have for your efforts…".

43.     All of Dr. Nickeleit's employee reviews on file, including his tenure reviews

12

at UNC Hospital/SOM were always positive. His latest faculty review and assessment in late 2021 was excellent. He was never reprimanded for any negative conduct or behavior. His professional work has never been called into question. On the contrary, it was in fact the subject of praise. He was never previously disciplined formally or informally by UNC Hospital/SOM.

## II.  Nephropathology lab at UNC Hospital/SOM

44.  Nephropathology is a highly specialized niche in pathology involving the diagnostic evaluation of kidney biopsies and nephrectomies from both transplanted and native kidneys.

45.  Dr. Jennette created the Division of Nephropathology at UNC Hospital/SOM in 1978, and in or around 2000/2001, recruited Dr. Nickeleit to join and oversee the program, with Dr. Singh assisting starting in 2006. Over the years, Dr. Nickeleit and Dr. Singh together strived hard and succeeded in creating a division which provided an efficient process to perform accurate and timely biopsy interpretations for patients suffering from serious or life-threatening kidney diseases.

46.  The Division of Nephropathology at UNC Hospital/SOM, under the direction and supervision of Dr. Nickeleit and Dr. Singh, has thrived and is considered one of the best Nephropathology Centers in the world.  It has been highly profitable over decades and even during the recent COVID-Pandemic. Profits have been generated by Plaintiffs' clinical work rendering diagnoses on kidney biopsies. Net profits benefitted not

only the Division of Nephropathology but also the Department of Pathology and UNC-SOM.

47.     In or about 2019, Dr. Jennette announced his impending resignation as then Chair of the Department of Pathology and his entry into phased retirement. Prior to his resignation, he informed Dr. Nickeleit and Dr. Singh that without his personal protection and with a new Chair in place, the organizational structure of the Division of Nephropathology and their positions could be in jeopardy.

## III.     Turnover of Chairman

48.     In September 2019, Defendant Broaddus ascended to Chair of the Department of Pathology. The atmosphere at UNC Hospital/SOM changed. Defendant Broaddus, over time, became more and more unsupportive and ultimately outright hostile towards Dr. Nickeleit and Dr. Singh.  In 2021, he began to directly "encourage" Dr. Nickeleit and Dr. Singh to resign from their tenured university positions and "go somewhere else."

49.     As internationally recognized and accomplished diagnostic nephropathologists and researchers, neither Dr. Nickeleit and Dr. Singh had any desire to leave their tenured faculty positions or abandon their professional work and career at UNC Hospital/SOM. As a result, in July 2020, UNC Hospital/SOM and specifically Defendant Broaddus, began disruptive practices to undermine the serious and important work their Division was doing and further accelerating until the present.  Defendant Broaddus made

14

it impossible for Dr. Nickeleit and Dr. Singh to successfully continue with their clinical work, and he seriously impaired collaborative research projects.

50.     The logistics needed for Plaintiffs to conduct research and to collaborate have been entirely eroded by UNC Hospital/SOM and Defendant Broaddus. As a result of worsening workplace conditions, Ms. Bawana "Donna" Thompson, the lead research specialist, and supervisor of projects conducted with Dr. Nickeleit and Dr. Singh, recently gave notice of her intent to resign. Ms. Thompson worked with Plaintiffs since 2003.

51.     In addition to ruining a world-renowned program to try and force the resignation of two tenured and celebrated physicians, the Defendants, under Defendant Broaddus supervision, conspired to target and force the resignations of Dr. Nickeleit and Dr. Singh, through unsupported disciplinary complaints and sanctions that were issued without the proper, necessary and required procedural protections (a proper investigation and hearing), and, thus, deprived Dr. Nickeleit and Dr. Singh of their livelihood, reputations and rights without due process.

## IV.     The HR Complaints

52.     On January 14, 2021, Dr. Nickeleit received a Confidential Notification of an Impending HR Investigation claiming there were complaints made against him on October 12, 2020, and on November 3, 2020. Dr. Singh, similarly, received notification on January 14, 2021, of complaints lodged against her on November 3, 2020.

53.     The January 14, 2021, communication from HR provided to Dr. Nickeleit

15

and Dr. Singh, contained only anonymous, broad allegations that UNC Hospital/SOM received complaints of "disruptive and inappropriate behavior in the workplace". There were no specific facts provided, nor were "the complainants" identified.

54. On March 16, 2021, Dr. Nickeleit and Dr. Singh received separate emails from Defendant Voss of the HR Department (the "March 16, 2021, email"). The HR communication listed broad, vague, and anonymous allegations that Dr. Nickeleit and Dr. Singh supposedly behaved in an inappropriate and unprofessional manner, that they allegedly refused to provide biopsy results to anyone except the attending physician, and that they faxed preliminary diagnostic reports to the UNC Hospital/SOM Division of Nephrology among others. Additionally, they were falsely accused of having violated existing policies.

55. The March 16, 2021, email states the following:

On November 3, 2020, the University and the UNC Health Care Audit, Compliance & Privacy Services Office received a corporate compliance complaint alleging you engaged in inappropriate and unprofessional conduct. The specific allegations include a claim that you do not respect the nephrology trainees and refuse to give biopsy results to individuals if they are not an attending physician, in violation of existing protocols and potentially impacting patient care. It was also alleged that preliminary diagnoses are faxed several days late, and that significant changes to diagnoses are not timely reported to treating clinicians. It was also alleged that you expect other clinicians to print indication notes or demand that they be stated in a specific way, and that these demands are inconsistent with existing processes and create additional unnecessary work for others.
The complaint alleges that you made condescending and intimidating remarks towards other providers, as well as staff and learners during clinical meetings, clinical conferences, and discussions involving HC and SOM personnel. In addition, it was alleged by circumventing procedures,

16

protocols, and proposed discussions for improvement that you have failed to work cooperatively with others in the work environment. The alleged behaviors were described and an ongoing pattern of behavior and not an isolated incident.

56. The HR notification did not provide any specific detailed information. Furthermore, at no time during the subsequent investigation did UNC Hospital/SOM provide any such information. Even more incredible, the nebulous allegations in the HR Report failed to differentiate between Dr. Singh or Dr. Nickeleit, as to who supposedly made the purported demeaning or offensive comments to team members.

57. The HR notification further failed to identify any established policies that Dr. Nickeleit and/or Dr. Singh purportedly violated.

58. The standard operating procedure at the time these complaints were purportedly made did not include faxing preliminary diagnostic reports to UNC Hospital/SOM Nephrology colleagues.

59. Certainly, none of the allegations mentioned in the HR notification against Dr. Nickeleit and/or Dr. Singh amounted to conduct that could jeopardize patient care or posed immediate threat to safety or health.

60. Even Defendant Broaddus, who was "privy" to the HR complaints, saw no reason to not renew Dr. Nickeleit's and Dr. Singh's hospital clinical privileges and reappointment to the Medical Staff in April 2021. This reappointment for both Dr. Nickeleit and/or Dr. Singh became effective July 2021 and remained in effect until they were each suspended, without justification, on March 8, 2022, at 5:00 p.m.

17

61.     On April 29, 2021, and again on May 5, 2021, Dr. Nickeleit requested detailed supporting information from HR regarding the alleged accusations against him. Defendant Voss promptly responded to both Dr. Nickeleit and Dr. Singh, stating that "detailed information was already provided". In addition, Defendant Voss stated that no additional information existed and there was nothing further to provide.

62.     No information (identification of complainants or when complaints were made), or details of wrongdoing (specific policy violations or details as to how Plaintiffs purportedly violated any existing policy) were ever provided to Dr. Nickeleit or Dr. Singh.

63.     Dr. Nickeleit and Dr. Singh fully cooperated with the HR investigation. Dr. Nickeleit was first interviewed by Defendants Voss and Hoar on May 20, 2021. Since, Dr. Nickeleit was never fully informed of the specific allegations him, or provided with documentation regarding same, he gathered any materials he thought could be relevant in order to defend his reputation and livelihood. He provided a multi-page pdf portfolio of the supporting documents, via email to HR investigators on May 25, 2021, to refute the broad-based allegations discussed during the interview.

64.     In August 2021, Dr. Nickeleit sat for a second interview. Subsequently, Dr. Nickeleit did not receive any further communication or information from HR or UNC Hospital/SOM through the end of 2021.

65.     Similarly, On May 11, 2021, Dr. Singh was interviewed by Defendants Voss and Hoar via Zoom. Due to the fact that Dr. Singh was never fully informed of the specific

18

allegations her, or provided with documentation regarding same, she gathered any materials she thought could be relevant in order to defend her reputation and livelihood. She provided a multi-page pdf portfolio of the supporting documents, via email to HR investigators on May 18, 2021, to refute the broad-based allegations discussed during the interview.

66.     In August 2021, Dr. Singh sat for a second interview. Subsequently, Dr. Singh did not receive any further communication or information from HR or UNC Hospital/SOM through the end of 2021.

67.     During the pendency of the investigation, Dr. Nickeleit and Dr. Singh continued to work as they had before.  They each maintained medical clinical privileges and fulfilled their duties in the Division of Nephropathology. No one questioned their ability or capacity to work with patients, staff, trainees, students, and fellows. Due to the silence from HR and their continued unfettered access to the Division, Dr. Nickeleit and Dr. Singh assumed the HR Investigation had run its course and they would receive notification that the investigation was completed without a negative finding against them.

68.     On January 31, 2022, Dr. Nickeleit and Dr. Singh were each notified by Defendant Ivester that the "HR Investigation" was completed, and the official report was submitted to UNC Hospital/SOM's Professional Executive Committee requesting that corrective action be taken by Medical Staff Executive Committee ("MSEC").

69.     The corrective actions suggested in the HR Report *did not include a*

*suspension or termination* of Dr. Nickeleit's and Dr. Singh's clinical privileges and the HR Report *did not contain a finding* that either physician jeopardized patient care or posed an immediate threat to health or safety. The HR report was signed by Defendants Voss and Hoar, and signed off by their supervisor, Defendant Lineberry.

70.     Dr. Nickeleit and Dr. Singh were each further informed on January 31, 2022, by Defendant Ivester, that an Ad-Hoc Committee of the MSEC was being convened to perform its own investigation based upon the HR Report.

## V.     The Ad-Hoc Committee Investigations and Findings

71.     The Ad-Hoc Committee was formed on or about January 31, 2022, and thereafter commenced its investigation.

72.     On February 2, 2022, before Dr. Nickeleit and Dr. Singh were even provided with a copy of the HR Investigation Report, they were asked to meet with Defendant Broaddus and a Human Resources "neutral observer," Ms. Bonnie Smith. This meeting took place in Dr. Singh's office in the Division of Nephropathology.  Defendant Broaddus said that it was his decision to strip Dr. Nickeleit and Dr. Singh of all administrative titles, teaching duties and all interactions with clinical staff, medical students, residents, and fellows.  He claimed that he was entitled to do this as Chair of the Department, even though the investigation was still in the investigatory stage, and the MSEC had not reached a final decision.

73.     More disturbingly, Defendant Broaddus tried to justify his position by

20

claiming it was his "moral duty, moral obligation" to "shield everyone from [them]".

74.     After the meeting with Defendant Broaddus on February 2, 2022, Dr. Singh and Dr. Nickeleit each emailed Defendant Hoar at HR and requested that a copy of the final HR Report be sent to them. Defendant Hoar sent a copy to Dr. Nickeleit and Dr. Singh on February 3, 2022.

75.     A review of the full HR Report showed that the corrective actions suggested therein did not include a suspension or termination of Dr. Nickeleit's or Dr. Singh's clinical privileges and the HR Report did not contain any finding that they, individually or collectively, jeopardized patient care or posed an immediate threat to health or safety.

76.     On February 7, 2022, Dr. Nickeleit and Dr. Singh each received a notification from Defendant Ivester, that they were to meet with the Ad-Hoc Committee on February 10, 2022. The separate meetings were conducted over Zoom and lasted approximately one (1) hour.

77.     Without addressing the specific allegations in detail with either Dr. Nickeleit or Dr. Singh, the Ad-Hoc Committee subsequently concluded that they each were lacking in "*interpersonal communication*" skills and behaved in an unprofessional manner which led to the "*maltreatment of employees, faculty, and learners*." See, Ad-Hoc Committee Report p. 1.

78.     The report went on to state as follows:

*...There can be no doubt that shaming, blaming, and intimidating individuals are not examples of trivial interpersonal communications, but are failures that require immediate attention. To not do so may lead to systemic abuses, maltreatment, and a fragmented culture. Communicating in a disrespectful, insulting, and demeaning manner erodes trust and negatively affects morale. As many of the interviewees confirmed, such behavior often results in a loss of productivity, a toxic environment, and turnover. It has the potential to damage someone's career, erode interpersonal relationships, and substantially decrease trust in the supervisor and leadership team."*

Ad-Hoc Committee Report p. 1.

79.     Both Dr. Nickeleit and Dr. Singh unequivocally deny engaging in any such alleged wrongful behavior and specifically deny the behavior described in the Ad-Hoc Committee Report.

80.     Second, the Ad-Hoc Committee Report is devoid of any expression of wrongful behavior by Dr. Nickeleit and/or Dr. Singh that led to any "*systemic abuses, maltreatment, and a fragmented culture,*" nor did it result in a "loss of productivity, a toxic environment, and turnover." While the Ad-Hoc Committee Report referenced the "potential" damage that could occur from the Committee's unproven conclusion that "systematic abuses" occurred, no actual harm or damage was alleged (or found).

81.     The report merely states these events "may" happen, and such behavior "could" result in such outcomes, demonstrating that there was no imminent danger. Moreover, the approximate fifteen months in between the time the complaints were purportedly made, and the Ad-Hoc Committee Report would preclude a finding of imminence.

22

82.    Even more shockingly was the Ad-Hoc Committee's failure to state in its report what Dr. Nickeleit and/or Dr. Singh purportedly said or did that *could have* led to such findings.

83.    Conspicuously absent is any finding that such "behavior" affected patient care, much less posed any imminent dangers to health or safety.

84.    Notwithstanding and quite unbelievably, the Ad-Hoc Committee Report, without justification, recommended the drastic temporary suspension of Dr. Nickeleit's and Dr. Singh's hospital privileges, pending completion of a course designed for professionals accused of unprofessional behavior.

85.    As a result of these unsupported findings, on March 3, 2022, Dr. Nickeleit and Dr. Singh were each notified by Defendant Ivester that a special executive session of the MSEC, was scheduled for March 7, 2022, to determine the outcome of the findings based on complaints lodged over fifteen months prior.

## VI.    THE UNJUSTIFIED DECISION OF THE MSEC

86.    On March 7, 2022, after the MSEC met, Dr. Nickeleit and Dr. Singh each received an email from Defendant Ivester, informing them that the MSEC had reached a decision and that their respective clinical privileges were ***permanently revoked*** as of 5:00 p.m. on March 8, 2022.

87.    The MSEC conclusion was contained in a letter to the Plaintiffs from Defendant Ivester dated March 8, 2022. After playing "hurry up and wait" for fifteen (15)

months, without warning or justification, Dr. Singh and Dr. Nickeleit were each stripped of their clinical privileges. The MSEC Report expressly stated that the decision was based upon the HR Report and the Ad-Hoc Committee Report.

88.     The HR Report and the Ad-Hoc Committee Report are entirely devoid of any allegations, confirmed or otherwise, indicating that Dr. Nickeleit and Dr. Singh, individually or collectively, jeopardized patient care or constituted an immediate threat to health or safety (as required by the UNC Hospital/SOM Bylaws to take immediate corrective action).

89.     The Defendants reported the immediate termination of privileges to the National Practitioner Data Bank processed on March 16, 2022, affecting not only Dr. Nickeleit's and Dr. Singh's privileges, but also their livelihood and reputation. Reporting these highly accomplished and distinguished physicians as threats to the health or safety of patients is one of the most absurd parts of all.

90.     On March 8, 2022, Dr. Nickeleit and Dr. Singh each received an email from Defendant Broaddus stating that they were no longer permitted normal entry to the Division of Nephropathology where their offices are located and where their research is conducted. He initially limited their weekday access to 5:00 p.m. – 7:59 a.m. His justification was to minimize the "possible disturbances of clinical staff," with whom they had worked and supervised for years.

91.     In response to requests for a hearing, on March 10, 2022, Defendant Ivester

24

informed Plaintiffs that they had a right to request a hearing and with regard to the evidence supporting the claims against them he stated: "[y]ou would be provided with any documents or *evidence deemed to be relevant, though you essentially have all materials that were considered." (Emphasis added).* Plaintiffs have never received anything other than the vague and non-specific anonymous allegations contained within the HR report which both the Ad Hoc Committee and the MSEC relied upon in forming their incredulous and unsubstantiated recommendations and actions.

92. On March 30, 2022, Defendant Broaddus made another unsubstantiated unilateral decision to further harm Dr. Nickeleit and Dr. Singh and limit their weekday access to the Division of Nephropathology to 6:00 p.m. - 7:59 a.m. Defendant Broaddus falsely claimed that Dr. Nickeleit and Dr. Singh each had disturbing interactions with Nephropathology staff though they had not interacted with office or lab staff in days. Defendant Broaddus' additional, punitive decision effectively halted Dr. Nickeleit's and Dr. Singh's research activities, and the time restriction precluded their collaboration and work with outside pharma companies and institutions in furtherance of life-saving kidney research and treatment.

93. On March 11, 2022, Dr. Nickeleit and Dr. Singh each received an email from Defendant Broaddus stating that their salaries would be reduced but he was not able to explain how that decision was reached.

94. On March 11, 2022, Dr. Nickeleit and Dr. Singh emailed Defendant Ivester

and requested a hearing be held in accordance with the UNC Hospital/SOM Staff By-Laws.

95.     Notwithstanding the emergent situation, four (4) days passed until Defendant Ivester responded, suggesting that a joint hearing should be held with Dr. Nickeleit and Dr. Singh because there was "significant overlap in the evidence and witnesses".

96.     Dr. Nickeleit and Dr. Singh individually responded to Defendant Ivester's email, requesting separate, independent hearings.  Defendant Ivester has yet to respond.

97.     Dr. Nickeleit and Dr. Singh are not being treated as individuals.  It is impossible to ascertain which Plaintiff is referenced in the anonymous allegations that have been conveyed to them. UNC Hospital/SOM HR rendered one report for both Plaintiffs and the Ad-Hoc Committee report fails to differentiate between Dr. Nickeleit and Dr. Singh.  UNC Hospital/SOM has improperly lumped all alleged accusations together and seemingly has attributed them to both Plaintiffs, further establishing the witch-hunt that has ensued over the past fifteen (15) months.

98.     Defendants have acted outside the scope of their authority by terminating Dr. Singh and Dr. Nickeleit's privileges without a proper hearing. The UNC Hospital/SOM Bylaws provide in Article X (Hearing and Appellate Review Procedure) that "A medical Staff member is entitled to a Hearing before a committee of the Medical Staff when s/he receives notice that the Executive Committee or the Board is recommending…..b. The suspension or revocation of Medical Staff membership; and/or c. The denial, reduction, suspension or revocation of clinical privileges." Defendants did not allow Dr. Singh or Dr.

Nickeleit a hearing prior to terminating their respective privileges.

99.    Section IX.2.a. (Corrective Action/Summary Suspension) of the UNC Hospital/SOM Bylaws provides the only mechanism by which corrective action affecting a physician's privileges may be immediately taken without a hearing.  This section of the Bylaws provides for a summary suspension of privileges (***not termination***) where "immediate action must be taken in the best interest of patient care." ***There is no authority in the Bylaws allowing for termination without a hearing.*** Accordingly, there is absolutely no justification for the termination of Dr. Nickeleit's or Dr. Singh's privileges without a fair hearing.

100.    Moreover, in abrogation of their rights under UNC Hospital/SOM's Staff Bylaws (and under the 14th Amendment to the Constitution as discussed in more detail below), Plaintiffs have yet to receive a proper investigation report, identifying the complainants, the specific allegations against each Plaintiff, when and where such alleged conduct occurred, and/or whether the alleged conduct violates any policy then and there existing.

101.    Defendants further continue to deny Dr. Nickeleit's and Dr. Singh's rights under the Bylaws, and pursuant to the laws of the State of North Carolina, requiring a hearing before divesting a physician of their privileges. See, *Poe v. Charlotte Memorial Hospital, Inc.*, 374 F. Supp. 1302 (W.D.N.C. 1974).

102.    Here, not only did Defendants unlawfully terminate Dr. Nickeleit's and Dr.

27

Singh's privileges, Defendants collectively and without regard for Dr. Nickeleit or Dr. Singh, have wrongfully taken away their livelihood and ruined their reputations. Defendants, individually and collectively, targeted Dr. Nickeleit and Dr. Singh, in an effort that places their careers in jeopardy, by reporting the unsupported finding that Dr. Nickeleit and Dr. Singh pose an "immediate threat to health or safety" to the National Practitioners Data Bank.

103.    The baseless and false accusations which were the subject of the HR report and Ad-Hoc Committee findings resulted in the revocation of Plaintiffs' privileges, without due process, under the false pretense of "immediate threat to health or safety."

104.    The feigned concern for patient care is well refuted by the fact that neither Dr. Nickeleit, nor Dr. Singh, in their combined forty plus years as physicians at UNC Hospital/SOM, were ever the subject of a Morbidity and Mortality conference ("M&M"), nor were they *ever* accused of providing improper patient care or presenting a threat to patient safety. Moreover, neither the HR report or the Ad Hoc Committee findings make mention of any threat to patient care by Dr. Nickeleit's or Dr. Singh's "conduct."

105.    There is no doubt that Defendants' goal is to put immense pressure on Dr. Nickeleit and Dr. Singh to leave UNC Hospital/SOM, and they are taking unlawful action, without proper authority, to accomplish this goal.

**VII.    Plaintiffs' Injuries**

106.    Dr. Nickeleit and Dr. Singh have suffered immeasurable and irreparable

28

harm as a result of the wrongful termination of privileges without cause or proper procedural safeguards.

107.    The termination of privileges and the reporting of same to the National Practitioner Data Bank has caused them to suffer damages to their livelihood, reputation and their careers.

108.    In addition to the loss of privileges, Dr. Nickeleit and Dr. Singh have lost a significant portion of their salary and benefits.

109.    Defendants further compromised Dr. Nickeleit's and Dr. Singh's reputations and targeted their careers through the termination of collaborative efforts with pharma companies and other outside entities, which were an important part of their research, developed and performed by Dr. Nickeleit and Dr. Singh for over 20 years and which have gained them elite status within the Nephropathology community.

## COUNT I
## Violation of 42 U.S.C. § 1983
## (Denial of Fourteenth Amendment Due Process)

110.    Dr. Nickeleit and Dr. Singh repeat and reallege each and every allegation hereinabove as if fully set forth herein.

111.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

112.    A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

113.    It has long been recognized by the 4th Circuit that physician staff privileges at a hospital constitutes "valuable property protected by the due process clause of the Fourteenth Amendment." *Poe*, 374 F. Supp. 1302. A physician's hospital privileges cannot be terminated without affording due process. See, *Duffield v. Charleston Area Medical Ctr.*, 503 F.2d 512, 515 (4th Cir. 1974), *overruled on other grounds*; *Christhilf v. Annapolis Emergency Hospital Assn., Inc.,* 496 F.2d 174, 178 (4th Cir. 1974), *overruled on other grounds*.

114.    Defendant UNC Hospital/SOM is a public entity that receives large amounts of state and federal funding and is therefore subject to the Fourteenth Amendment. The UNC Entities and the Individual Defendants, as state actors, are bound by the requirements of the United States Constitution.

115.    Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

116.    Pursuant to the rights guaranteed by the United States Constitution, Dr. Nickeleit and Dr. Singh were entitled to adequate notice and a meaningful opportunity to be heard. Accordingly, the Defendants, individually and collectively, violated due process when they unlawfully terminated Dr. Nickeleit's and Dr. Singh's physician staff privileges

30

without a meaningful opportunity to be heard. Good faith does not justify the deprivation of due process rights. *Poe*, 374 F. Supp. 1302.

117.    Dr. Nickeleit and Dr. Singh have each been further deprived of due process as they were not given advance notice of the charges against them in sufficient detail to permit a response, nor were they given an opportunity to question and cross examine adverse witnesses and accusers or to challenge the accusations of wrongdoing and to present evidence on their own respective behalf.

118.    The failure by Defendants to provide Dr. Nickeleit and Dr. Singh with reasonable notice of the charges and fair opportunity to present a defense, were in violation of Plaintiffs' due process rights.

119.    The deprivation of Dr. Nickeleit's and Dr. Singh's physician hospital privileges without due process protections have caused them to suffer irreparable harm to their livelihood and reputation.

120.    Dr. Nickeleit and Dr. Singh seek prospective relief against all Defendants, in the form of reinstatement and an injunction against Defendants making further statements or taking further action to injure their reputations.

121.    The Supreme Court's *Ex parte Young* decision instructs that Eleventh Amendment immunity does not bar a plaintiff's request for prospective injunctive relief or declaratory judgment against a state actor named in their official capacity. *See generally Ex parte Young*, 209 U.S. 123, 150-156 (1908). *See also Green v. Mansour*, 474 U.S. 64

31

(1985) (determining declaratory relief is within *Ex parte Young*'s purview when violations of federal law are threatened or ongoing).

122.  Dr. Nickeleit and Dr. Singh further seek to hold the Defendants Broaddus, Ivester, Voss, Hoar and Lineberry liable in their "individual capacity" because they individually and/or collectively knew or had reason to know that their actions violated the Fourteenth Amendment and the UNC Hospital/SOM Bylaws. Defendants were acting under color of state law when intentionally violating known constitutional or statutory rights.

123.  Defendants Broaddus, Ivester, Voss, Hoar and Lineberry conspired to oust Dr. Nickeleit and Dr. Singh by participating in a process designed to terminate their privileges without proper cause, or the minimum standards of fairness required by the Due Process Clause of the Fourteenth Amendment and the UNC Hospital/SOM Bylaws.

124.  Without regard for due process rights, Defendants Broaddus, Ivester, Voss, Hoar and Lineberry individually and collectively engaged in the process that resulted in the improper termination of Dr. Nickeleit's and Dr. Singh's physician privileges.

125.  Defendants Broaddus, Ivester, Voss, Hoar and Lineberry unlawfully deprived Dr. Nickeleit and Dr. Singh of a proper hearing by making an unjustified and unsupported determination that they presented threat to health or safety to individuals or patient care, where realistically no such ongoing threat existed.

126.  Defendants Broaddus, Ivester, Voss, Hoar and Lineberry not only failed to

32

conduct a meaningful investigation before determining that Dr. Nickeleit and Dr. Singh posed an imminent threat to health or safety to individuals or patient care, but ignored the findings contained in both the HR Report and the Ad Hoc Committee Report, neither of them finding any threat to patient care.

127.    The finding that a severe imminent threat existed was contrary to the HR Report and the Ad Hoc Committee Report and therefore warranted a proper hearing, not a rushed, summary termination of privileges, which is not even permitted under UNC Hospital/SOM guidelines.

128.    The finding that a severe imminent threat existed is further contradicted by the length of time between the time the Complaints were made and the time of the determination of imminence (15 months later).

129.    Defendants' actions deprived Dr. Nickeleit and Dr. Singh of their property and liberty interests when they terminated their physician privileges without a hearing and in contravention of the HR report and Ad Hoc Committee findings, neither of which noted any threat to patient care, much less an imminent threat.

130.    The actions of the Defendants further deprived Dr. Nickeleit and Dr. Singh of their liberty interest in their reputation and choice of occupation when they falsely represented to the National Practitioner Data Bank, that Dr. Nickeleit and Dr. Singh posed an immediate threat to health or safety, when no such finding was actually reported by HR or the Ad-Hoc Committee through their investigations. Such actions by Defendants were

33

vicious and meant to ruin Dr. Nickeleit's and Dr. Singh's careers.

131. The Defendants caused further harm to Dr. Nickeleit and Dr. Singh by severely and unjustifiably affecting their livelihood, by reducing their compensation, restricting their access to the Division and the programs they have built over the last 20 years, terminating their benefits, and defaming Dr. Nickeleit and Dr. Singh to their colleagues.

132. As fully detailed above, the unlawful actions taken by the Individual Defendants, acting in their individual capacities, were motivated by an evil motive or intent or, at the very least, reckless or callous indifference to Dr. Singh's and Dr. Nickeleit's right to due process, warranting an award of punitive damages to each Plaintiff.

133. As a result of the foregoing, Dr. Nickeleit and Dr. Singh are entitled to prospective relief against Defendants, and compensatory and punitive damages against the Individual Defendants acting in their individual capacities in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Dr. Nickeleit and Dr. Singh demand judgment in the form of prospective relief against all Defendants and compensatory and punitive damages to be determined at trial against Defendants Broaddus, Ivester, Voss, Hoar and Lineberry, including, without limitation, damages to reputation, physical well-being, emotional and psychological damages, past and future economic losses, and loss of future career opportunities,

34

plus prejudgment interest, attorneys' fees, expenses, costs and disbursements **against,** for violations

of constitutional due process pursuant to 42 U.S.C. § 1983, and all other just and appropriate relief.

## JURY DEMAND

Dr. Nickeleit and Dr. Singh herein demands a trial by jury of all triable issues in the present

matter.

**Dated: New York, New York**
          **April 13, 2022**

**PARRY LAW, PLLC**
*Attorneys for Plaintiffs*

*/s/ K. Alan Parry*
K. Alan Parry, N.C. Bar No. 31343
Andrew A. Kasper, N.C. Bar No. 44515
The Europa Center
100 Europa Drive, Suite 351
Chapel Hill, NC 27517
Phone: 919.913.3320
Fax: 919.869.2600
kap@parryfirm.com
aak@parryfirm.com

**-and-**

**NESENOFF & MILTENBERG, LLP**
*Attorneys for Plaintiffs*

*/s/ Andrew T. Miltenberg*
Andrew   T.   Miltenberg,   (*Special   Appearance
pending*)
Stuart Bernstein, (*Special Appearance pending*)
Amy Zamir, (*Special Appearance pending*)
Janine L. Peress, (*Special Appearance pending*)
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com

35

sbernstein@nmllplaw.com
azamir@nmllplaw.com
jperess@nmllplaw.com

36