IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| HARSHARAN KAUR SINGH, M.D. and VOLKER REINHOLD AUGUST NICKELEIT, M.D., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 1:22CV294 |
| UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, UNIVERSITY OF NORTH CAROLINA HEALTH CARE SYSTEM d/b/a UNC HEALTH CARE, UNIVERSITY OF NORTH CAROLINA SCHOOL OF MEDICINE, JANET HADAR, MSN, in her official capacity, THOMAS S. IVESTER, M.D., individually and in his official capacity, RUSSELL BROADDUS, M.D., individually and in his official capacity, LISA VOSS, individually and in her official capacity, DEREK V. HOAR, individually and in his official capacity, and HARVEY L. LINEBERRY, PhD., individually and in his official capacity, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

**OSTEEN, JR., District Judge**

Presently before this court is Plaintiffs Harsharan Kaur Singh, M.D. and Volker Reinhold August Nickeleit, M.D.'s Motion for a Temporary Restraining Order and Preliminary Injunction,

(Doc. 2), against Defendants the University of North Carolina at Chapel Hill ("UNC-CH"), the University of North Carolina Health Care System d/b/a UNC Health Care ("UNC-Health"), the University of North Carolina School of Medicine ("UNC-SOM"), Janet Hadar, MSN, Thomas S. Ivester, M.D., Russell Broaddus, M.D., Lisa Voss, Derek V. Hoar, and Harvey L. Lineberry, Ph.D.[1] Defendants have filed a Motion to Dismiss Pursuant to Rule 12(b)(1), (Doc. 16), and UNC-Health Defendants have filed a Motion for Leave to File Sur-Reply, (Doc. 26). This court held a hearing on the motions on May 6, 2022. (Minute Entry 05/06/2022.)

For the reasons that follow, this court will grant Defendants' Motion for Leave to File Sur-Reply, (Doc. 26), and will deny the Motion for Temporary Restraining Order and Preliminary Injunction, (Doc. 2).

I.  **PROCEDURAL HISTORY**

Plaintiffs filed their Complaint on April 13, 2022. (Compl. (Doc. 1).) That same day Plaintiffs filed a Motion for a Temporary Restraining Order and Preliminary Injunction, (Doc. 2), and a memorandum in support of their motion, (Mem. of Law in Supp. of Pls.' Mot. for a TRO & Prelim. Inj. ("Pls.' Br.")

---

[1] This court will refer to UNC-Health, Dr. Ivester, and Hadar collectively as the "UNC-Health Defendants," and will refer to UNC-CH, UNC-SOM, Dr. Broaddus, Dr. Lineberry, Voss, and Hoar as the "UNC-CH Defendants."

- 2 -

(Doc. 3)). UNC-Health Defendants filed a brief in opposition to Plaintiffs' motion, (UNC-Health Defs.' Mem. of Law in Opp'n to Pls.' Mot. for TRO & Prelim. Inj. ("UNC-Health Defs.' Br.") (Doc. 19)), as did UNC-CH Defendants, (UNC-CH Defs.' Br. in Opp'n to Pls.' Mot. for TRO & Prelim. Inj. ("UNC-CH Defs.' Br.") (Doc. 20)). Plaintiffs replied to Defendants' responses. (Pls.' Reply to UNC-Health Defs.' Mem. of Law in Opp'n to Pls.' Mot. for TRO & Prelim. Inj. ("Pls.' UNC-Health Reply") (Docs. 23); Pls.' Reply to UNC-CH Defs.' Br. in in Opp'n to Pls.' Mot. for TRO & Prelim. Inj. ("Pls.' UNC-CH Reply") (Doc. 24).) UNC-Health Defendants then filed a Motion for Leave to File Sur-Reply, (Doc. 26), and attached their proposed sur-reply brief, (UNC-Health Defs.' Sur-Reply in Opp'n to Pls.' Mot. for TRO & Prelim. Inj. ("UNC-Health Defs.' Sur-Reply") (Doc. 26-1)).

Additionally, all Defendants filed a Motion to Dismiss Pursuant to Rule 12(b)(1), (Doc. 16), and filed a brief in support of their motion, (Defs.' Br. in Supp. of Mot. to Dismiss ("Defs.' MTD Br.") (Doc. 17)). Plaintiffs responded, (Pls.' Br. in Opp'n to Defs.' Mot. to Dismiss ("Pls.' MTD Resp.") (Doc. 22)), and Defendants replied, (Defs.' Reply Br. in Supp. of Mot. to Dismiss ("Defs.' MTD Reply") (Doc. 28)).

On May 6, 2022, this court heard argument on the parties' motions. (Minute Entry 05/06/2022.) Having reviewed the motions,

the supporting documents, all matters of record, and the briefing, this court's findings of fact and conclusions of law are contained herein. Infra Parts II, IV–V. These findings and conclusions are only made for the purpose of addressing the motion for a preliminary injunction and are therefore not final.

## II.  FINDINGS OF FACT

### A.  The Parties

UNC-CH is a public university in North Carolina. (See Compl. (Doc. 1) ¶ 14.)[2] UNC-CH is comprised of various institutions of higher education, including UNC-SOM. (Id.) Dr. Lineberry is the Associate Dean of Human Resources at UNC-SOM. (Id. ¶ 22.) Hoar and Voss are human resource employees at UNC-SOM. (Id. ¶¶ 20–21.) Dr. Broaddus is Chair of the Pathology and Laboratory Medicine Department at UNC-SOM. (Id. ¶ 19.)

UNC-Health is an integrated health care system owned by North Carolina and administered as an affiliate enterprise of UNC-CH. (Id. ¶ 15.) It consists of UNC Hospitals and its provider network, the clinical program of the UNC-SOM, and affiliate hospitals throughout the state. (Id.) Hadar is the

---

[2] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

President of UNC Hospitals, and Dr. Ivester is the Chief Medical Officer at UNC Hospitals. (Id. ¶¶ 17–18.)

Plaintiffs are tenured professors of pathology at UNC-CH. (See id. ¶¶ 12–13.)

## B.    **Human Resources Investigation**

In the fall of 2020, UNC-SOM's Human Resources Office received complaints about Plaintiffs. (Id. ¶ 52.) The Human Resources Office engaged in a lengthy investigation into the allegations, including interviewing Plaintiffs. (See Doc. 3-3 at 2–3; Doc. 3-4 at 2–3; Compl. (Doc. 1) ¶¶ 61, 63–66.) Many individuals interviewed were concerned about retaliation by Plaintiffs, and some chose not to participate for that reason. (Doc. 3-3 at 3–4.) The Human Resources Office finished its investigation on January 21, 2022, and sent out the report (the "HR Report"). (Id. at 55.) Dr. Ivester and Dr. Broaddus both received the HR Report. (See Doc. 18-2.)

## C.    **Ad Hoc Committee and MSEC Investigation**

Subsequently, UNC Hospital/SOM's Professional Executive Committee requested that corrective action be taken by the Medical Staff Executive Committee ("MSEC"). (Compl. (Doc. 1) ¶ 68.) MSEC formed an Ad Hoc Committee to investigate based on the HR Report. (Id. ¶ 70; Decl. of Thomas S. Ivester, MD ("Ivester Decl.") (Doc. 18) ¶¶ 4–5, 7.) Plaintiffs met with the

- 5 -

Ad Hoc Committee on February 10, 2022. (Compl. (Doc. 1) ¶ 76.)
The Ad Hoc Committee submitted its report and recommendation to
MSEC on March 3, 2022. (Ivester Decl. (Doc. 18) ¶ 10; Docs. 3-5,
3-6.) MSEC then scheduled a special meeting for March 7, 2022.
(Compl. (Doc. 1) ¶ 85-86.) Plaintiffs were given notice of the
meeting and the opportunity to attend and speak or provide
written statements. (Docs. 18-7, 18-8.) Plaintiffs provided
written statements. (Ivester Decl. (Doc. 18) ¶ 12; Docs. 18-9,
18-10, 18-11.)

At the March 7 meeting, MSEC voted to recommend the Board
of Directors revoke Plaintiffs' clinical privileges, and also to
immediately revoke their privileges pending final decision by
the Board of Directors upon conclusion of the hearing and
appeals process. (See Docs. 18-14, 18-16.) The immediate,
interim revocation was issued by MSEC due to concerns about
potential impact on other individuals. (Ivester Decl. (Doc. 18)
¶¶ 13, 15; Docs. 18-14, 18-16.) The next day, Dr. Ivester sent
Plaintiffs letters providing formal notice of corrective action.
(Docs. 18-14, 18-16.) The letters stated that "[p]ursuant to
Article VI, Section 1(l) of the UNC Hospitals' Bylaws of the
Medical Staff ('Bylaws')" MSEC "voted to recommend rescinding
your appointment to the UNC Hospitals Medical Staff and revoking
your clinical privileges at UNC Hospitals." (E.g., Doc. 18-14 at

3.) The letter further stated that "[p]ursuant to Article I, Section 1(m)," the revocation of privileges "should become effective immediately after determining that a failure to act may result in imminent danger to the health of individuals." (E.g., id.) Dr. Ivester advised Plaintiffs of their "right to request a Hearing" "pursuant to Article VII, Section 3 of the Bylaws." (E.g., id.) He also included relevant portions of the Bylaws. (E.g., id. at 4-12.)

On March 11, 2022, Plaintiffs each emailed Dr. Ivester requesting a hearing. (Compl. (Doc. 1) ¶¶ 94, 96; Ivester Decl. (Doc. 18) ¶ 17.) Additionally, on March 16, 2022, Defendants reported the revocation of Plaintiffs' clinical privileges to the National Practitioner Data Bank ("NPDB"). (Id. ¶ 89; see also Docs. 3-9, 3-10.) The report indicated the revocation was permanent. (See Doc. 3-9 at 3; Doc. 3-10 at 3.)

Dr. Ivester contends that since the time Plaintiffs requested individual hearings, UNC Hospitals personnel have been working diligently to identify six individuals appropriate to serve on the two hearing panels. (Id. ¶ 21.) Those individuals have now been identified, and Plaintiffs have been contacted regarding the scheduling of their hearings. (Id. ¶¶ 21-22; see also Doc. 23-3.)

Additional facts will be addressed hereafter as necessary.

Before addressing the merits of Plaintiffs' motion for preliminary injunction, this court will first address UNC-Health Defendants' Motion for Leave to File Sur-Reply, (Doc. 26).

### III. <u>MOTION FOR LEAVE TO FILE SUR-REPLY</u>

UNC-Health Defendants have moved this court for leave to file a sur-reply. (Doc. 26.) Local Rule 7.3(h) governs reply briefs and states that they are "limited to discussion of matters newly raised in the response." "Courts in this district interpreting Local Rule 7.3(h) have consistently held that '[r]eply briefs . . . may not inject new grounds' for argument." <u>Pouncey v. Guilford Cnty.</u>, No. 1:18CV1022, 2020 WL 1274264, at *5 (M.D.N.C. Mar. 17, 2020) (alteration in original) (quoting <u>Triad Int'l Maint. Corp. v. Aim Aviation, Inc.</u>, 473 F. Supp. 2d 666, 670 n.1 (M.D.N.C. 2006)). "In sum, Local Rule 7.3(h) exists to give the replying party a chance to rebut newly raised arguments, not to give the replying party an unfair advantage in having a chance to make new arguments that should have been raised initially." <u>Id.</u>

Here, Plaintiffs argue in their reply brief to their Motion for a Temporary Restraining Order and Preliminary Injunction for the first time that Defendants violated Plaintiffs' procedural due process liberty interest by not giving Plaintiffs a hearing before reporting to the NPDB that Plaintiffs' privileges had

- 8 -

been permanently revoked. (See Doc. 23.) Plaintiffs raising this issue in their reply brief improperly "inject[s] new grounds for argument," Pouncey, 2020 WL 1274264, at *5 (internal quotation marks omitted), because it is not responsive to "matters newly raised in the response," LR 7.3(h), nor was it included in Plaintiffs' original brief, (Pls.' Br. (Doc. 3)). Allowing Plaintiffs to make this "new argument[] that should have been raised initially" gives Plaintiffs an "unfair advantage," Pouncey, 2020 WL 1274264, at *5, because Defendants are not entitled to respond to it, see Olvera-Morales v. Int'l Lab. Mgmt. Corp., 246 F.R.D. 250, 254 (M.D.N.C. 2007) ("Surreplies are generally disfavored[.]").

To remedy this unfair advantage, this court will grant UNC-Health Defendants' Motion for Leave to File Sur-Reply, (Doc. 26), and this court has considered Defendants' sur-reply, (UNC-Health Defs.' Sur-Reply (Doc. 26-1)), in full in adjudicating the pending motions.

## IV. <u>SUBJECT MATTER JURISDICTION ISSUES</u>

Through their Complaint and requested relief, Plaintiffs seek, <u>inter alia</u>, a preliminary injunction ordering Defendants to (1) reinstate Plaintiffs' clinical privileges, administrative titles, and compensation; and (2) retract their report to the NPDB regarding Plaintiffs' clinical privileges. (Doc. 2 at 5-6.)

- 9 -

Defendants have responded to the motion for a preliminary injunction, (UNC-Health Defs.' Br. (Doc. 19); UNC-CH Defs.' Br. (Doc. 20)), and, relatedly, moved to dismiss Plaintiffs' Complaint on subject matter jurisdiction grounds, (Doc. 16). "The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'" Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998) (alteration in original) (quoting Mansfield, C. & L.M.R. Co. v. Swan, 111 U.S. 379, 382 (1884)). The plaintiff, as the party asserting jurisdiction, bears the ultimate burden of proving such jurisdiction. Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982).

As will be explained, this court finds that certain Defendants are subject to dismissal on subject matter jurisdiction grounds. Thus, as relevant to the preliminary injunction, this court finds Plaintiffs have failed to demonstrate a likelihood of success on the merits as to those Defendants and, accordingly, the motion for preliminary injunction will be denied as to those Defendants.

Relatedly, as to subject matter jurisdiction, this court finds Plaintiffs' due process claim is not ripe and subject to dismissal for lack of subject matter jurisdiction. Even viewing

the facts in the light most favorable to the Plaintiffs, this
court finds the suspension of Plaintiffs' clinical privileges,
the reduction in salary, and loss of administrative titles are
all temporary actions within the purview of the Bylaws of UNC-
Health. These actions remain subject to a due process hearing
which the parties are in the process of scheduling. Defendants'
Motion to Dismiss Pursuant to Rule 12(b)(1), (Doc. 16), remains
under advisement and will be directly addressed in a separate
order.

### A. Sovereign Immunity

Defendants contend UNC-Chapel Hill, UNC-SOM, and UNC Health
are immune from suit under sovereign immunity. (Defs.' MTD Br.
(Doc. 17) at 11–13.) Plaintiffs concede UNC-CH and UNC-SOM are
immune from suit. (Pls.' MTD Resp. (Doc. 22) at 9.) Accordingly,
the preliminary injunction will be denied as to UNC-Chapel Hill
and UNC-SOM on sovereign immunity grounds.

Plaintiffs argue UNC-Health is not an arm or alter ego of
the State of North Carolina and therefore not immune from suit.
(Id. at 21–24.) The Eleventh Amendment to the Constitution "bars
federal courts from exercising jurisdiction over suits against
nonconsenting states or state entities." Kadel v. N.C. State
Health Plan for Teachers & State Emps., 12 F.4th 422, 428
(2021). North Carolina has not consented to being sued under

- 11 -

§ 1983 and therefore has not waived sovereign immunity in that context. Cf. Huang v. Bd. of Governors of Univ. of N.C., 902 F.2d 1134, 1139 (4th Cir. 1990) (finding that the State has not waived immunity as it applies to the state university system). Nor has Congress overridden North Carolina's sovereign immunity in that context. See Jennings v. Univ. of N.C. at Chapel Hill, 240 F. Supp. 2d 492, 498 (M.D.N.C. 2002) ("Congress has not overridden [sovereign] immunity in any relevant area save for Title VII.").

State sovereign immunity bars suit not only against a state, but also against an instrumentality of a state, such as a state agency, often referred to as an "arm of the State." See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100, 124 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."). Sovereign immunity applies to a state subdivision when "the governmental entity is so connected to the State that the legal action against the entity would . . . amount to the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties." Cash v. Granville Cnty. Bd. of Educ., 242 F.3d 219, 224 (4th Cir. 2001) (internal quotation marks omitted) (quoting Seminole Tribe of

- 12 -

<u>Fla. v. Florida</u>, 517 U.S. 44, 58 (1996)). On the other hand, sovereign immunity "does not immunize political subdivisions of the state, such as municipalities and counties, even though such entities might exercise a 'slice of state power.'" <u>Ram Ditta v. Md. Nat. Cap. Park & Plan. Comm'n</u>, 822 F.2d 456, 457 (4th Cir. 1987) (quoting <u>Lake Country Estates, Inc. v. Tahoe Reg'l Plan. Agency</u>, 440 U.S. 391, 401 (1979)).

To determine whether a state subdivision is entitled to Eleventh Amendment immunity, the Fourth Circuit examines four factors:

> (1) whether the state treasury will be responsible for paying any judgment that might be awarded; (2) whether the entity exercises a significant degree of autonomy from the state; (3) whether it is involved with local versus statewide concerns; and (4) how the entity is treated as a matter of state law.

<u>Ristow v. S.C. Ports Auth.</u>, 58 F.3d 1051, 1052 n.3 (4th Cir. 1995) (quoting <u>Ram Ditta</u>, 822 F.2d at 457–48); <u>see also</u> <u>U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency</u>, 745 F.3d 131, 136–38 (4th Cir. 2014) (identifying and applying the "four nonexclusive factors").

The first <u>Ram Ditta</u> factor has been described as the most important. <u>See, e.g.</u>, <u>Hess v. Port Auth. Trans-Hudson Corp.</u>, 513 U.S. 30, 49 (1994) (remarking that "the state treasury factor is the most important factor to be considered"); <u>Hutto v. S.C. Ret. Sys.</u>, 773 F.3d 536, 543 (4th Cir. 2014) (same). The Supreme

- 13 -

Court has observed that the first factor is "generally accorded
. . . dispositive weight." Hess, 513 U.S. at 49 (internal
quotation marks omitted). However, even when a court has
determined the first factor suggests the entity is an arm of the
state, courts often continue in analyzing the other factors.
See, e.g., McAdoo v. Univ. of N.C. at Chapel Hill, 248 F. Supp.
3d 705, 713–19 (M.D.N.C. 2017).

Plaintiffs assert "[t]here is no evidence that any judgment
against UNC-Health would be paid out of the State treasury."
(Pls.' MTD Resp. (Doc. 22) at 23.) Defendants "acknowledge[]
that [UNC-Health] currently does not receive an annual
appropriation from the General Assembly," but contends that
"[a]lthough a judgment against UNC Health would not directly
impact the state treasury, it is possible . . . that if a
judgment exceeded the available funds on hand, UNC Health could
look to the state for financial support." (Defs.' MTD Reply
(Doc. 28) at 5.) Because it is not obvious North Carolina would
pay any judgment against UNC-Health, this "first factor strongly
suggests that [UNC-Health] is not an arm of the state." Hammons
v. Univ. of Md. Med. Sys. Corp., 551 F. Supp. 3d 567, 586 (D.
Md. 2021).

The second factor considers the degree of autonomy UNC-
Health exercises, including who appoints UNC-Health's directors

- 14 -

or officers, who funds UNC-Health, and whether North Carolina retains a veto over UNC-Health's actions. See U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency, 804 F.3d 646, 668 (4th Cir. 2015). Also relevant is whether UNC "has the ability to contract, sue and be sued, and purchase and sell property, and whether it is represented in legal matters by the state attorney general." Id. "An entity may retain some operational independence in its day-to-day activities, yet still be considered an arm of the state." McAdoo, 248 F. Supp. 3d at 716 (citing Md. Stadium Auth. v. Ellerbe Becket Inc., 407 F.3d 255, 264 (4th Cir. 2005)).

Although UNC-Health retains autonomy in some parts of its operations, the state retains significant participation in and control of UNC-Health's operations, both directly and indirectly. For one, the Board of Governors is significantly involved in and has authority over UNC-Health's affairs.[3] Twelve of the at-large members of UNC-Health's Board of Directors are appointed by the Board of Governors after consultation with the President of UNC-CH. N.C. Gen. Stat. § 116-37(b)(1)(b.). Additionally, appeals from the Board of Directors' actions are heard by the Board of Governors. See id. § 116-37(b)(4).

---

[3] The Board of Governors is an arm of the state responsible for planning and developing a coordinated system of higher education in North Carolina. N.C. Gen. Stat. § 116-11(1).

The state is also involved in overseeing decisions concerning UNC-Health's officers and employees. UNC-Health's Board of Directors must submit candidates for Chief Executive Officer of UNC-Health "to the President of The University of North Carolina, who if satisfied with the quality of one or more of the candidates, will nominate one as Chief Executive Officer, subject to selection by the Board of Governors." Id. § 116-37(c)(1).[4] While UNC-Health's Board of Directors determines initial employee classifications and pay plans, it must submit those classifications and pay plans to the Office of State Human Resources for review. Id. § 116-37(d).

Although UNC-Health has some discretion in purchasing and entering into contracts, UNC-Health is "subject to the provisions of the State Budget Act." Id. § 116-37(e), (h); see also id. § 116-37(i) (requiring UNC-Health to submit all policies and regulations regarding acquiring and disposing of real property to the State Property Office for review). UNC-Health must submit annual reports to the Joint Legislative Commission on Government Operations, which must include actions taken by the Board of Directors. Id. § 116-37(g).

_____

[4] The President of the University of North Carolina is a state employee. Cf. N.C. Gen. Stat. § 116-14.

This non-exhaustive list makes clear that although UNC-Health may function similarly to an independent corporate medical system in some respects, "it is nevertheless tethered to State government and subject to State oversight in important ways." Hammons, 551 F. Supp. 3d at 587; see also McAdoo, 248 F. Supp. 3d at 718 ("Despite exercising some level of autonomy in carrying out day-to-day operations, UNC and its constituent institutions remain subject to the control and veto power of the General Assembly."). Therefore, this court concludes that UNC-Health is not autonomous from the State of North Carolina, and the second factor weighs in favor of finding that UNC-Health is an arm or alter ego of the State of North Carolina.

The third factor examines whether the entity is involved with state concerns as distinct from non-state concerns, including local concerns. The North Carolina General Assembly declared that UNC-Health was created "to provide patient care, facilitate the education of physicians and other health care providers, conduct research collaboratively with the health sciences schools of [UNC-CH], and render other services designed to promote the health and well-being of the citizens of North Carolina." N.C. Gen. Stat. § 116-37(a)(1). This language reflects involvement with statewide concerns, rather than local ones, and thus this factor weighs in favor of finding that UNC-

- 17 -

Health is an arm or alter ego of the State of North Carolina. See Hammons, 551 F. Supp. 3d at 586-87 (determining the third Ram Ditta weighed in favor of finding University of Maryland's state-run hospital system was an arm of the state where "[t]he Maryland General Assembly declared that [the system] was created to 'provide medical care . . . for the citizens of the State and region,' and that such care 'extend[s] to all citizens of the State . . . .'" (internal citation omitted) (quoting Md. Code Educ. § 13-302(1)-(2))).

The fourth factor, which requires consideration of the treatment of UNC-Health under North Carolina law, points in the same direction. "Although the question of whether an entity is an alter ego of the state is a question of federal, not state, law, the manner in which state law addresses the entity remains 'important, and potentially controlling.'" Md. Stadium Auth., 407 F.3d at 265 (quoting Hall v. Med. Coll. Of Ohio at Toledo, 742 F.2d 299, 304 (6th Cir. 1984)).

This court finds North Carolina law treats UNC-Health as a state agency. The State legislature designated UNC-Health "as an affiliated enterprise of the University of North Carolina." N.C. Gen. Stat. § 116-37(a)(1). Additionally, under North Carolina law, UNC-Health employees are state employees, id. § 116-37(d),

- 18 -

and UNC-Health is entitled to representation by the Attorney General of North Carolina, id. § 114-4.2B.

Although North Carolina courts have not ruled on whether UNC-Health is an agency of the state, federal courts have held UNC-Health is an arm of the state. See Thomas v. North Carolina, Civil Action No. 3:12-CV-00038-FDW-DCK, 2013 WL 566481, at *7 (W.D.N.C. Feb. 13, 2013) ("Defendants are all agencies of the State of North Carolina created pursuant to statute and, therefore, entitled to Eleventh Amendment immunity."); Solomon v. UNC Healthcare, 5:16-CV-24-FL, 2016 WL 6768920, at *4 (E.D.N.C. Oct. 19, 2016), report and recommendation adopted, 2016 WL 6683470 (E.D.N.C. Nov. 14, 2016). Although these courts did not specifically address the Ram Ditta factors, this court is persuaded by these decisions, especially when considering North Carolina statutes characterize UNC-Health's employees as state employees and provide for representation by the Attorney General. Therefore, this court finds the fourth factor weighs in favor of finding UNC-Health is an arm of the State of North Carolina.

Plaintiffs argue UNC-Health is like the Maryland National Capital Park and Planning Commission that the Fourth Circuit in Ram Ditta determined was not an arm of the state. (Pls.' MTD Resp. (Doc. 22) at 22–24.) However, UNC-Health is different from

- 19 -

the Commission in notable ways. For example, while "it [was] apparent that a judgment against the Commission would not be paid from the state treasury," Ram Ditta, 822 F.2d at 458, it is not so apparent that a judgment against UNC-Health would not be paid from North Carolina's treasury. Counsel for UNC-Health Defendants represented at the hearing that if UNC-Health did not have sufficient funds to cover a judgment, it was his view the state would cover any remaining amount. Even assuming counsel is mistaken, UNC-Health also differs from the Commission because the Commission was operating parks in two of Maryland's counties, id. at 459, whereas UNC-Health is a state-wide medical system, see N.C. Gen. Stat. § 116-37(a), concerned with providing medical care to all North Carolinians. Because UNC-Health differs from the Commission—indeed, the Fourth Circuit held none of the Ram Ditta factors weighed in favor of the Commission—this court finds Plaintiffs' argument unavailing.

Under the foregoing analysis, UNC, UNC-SOM, and UNC-Health are all subject to sovereign immunity. As a result, Plaintiffs' motion for a preliminary injunction will be denied as to these Defendants.

B.    **Individual Defendants in Their Official Capacities**

For reasons that will be explained hereafter, this court finds Plaintiffs' request for injunctive relief is not ripe as

to the suspension of clinical privileges, reduction in salary, and loss of title because the due process required by the Bylaws of UNC-Health is in effect, a hearing will be held as required by those bylaws and is currently subject to scheduling by the parties. However, this court finds Plaintiffs could be entitled to injunctive relief as to Defendants' communication to the NPDB, see infra Section V.B, and because it was UNC Hospitals who reported to the NPDB, (see Docs. 3-9, 3-10), this court will determine whether subject matter jurisdiction exists as to individual Defendants Dr. Ivester and Hadar, as employees of UNC-Health in their official capacities or whether, instead, they are immune from suit.

The Supreme Court has held "that neither a State nor its officials acting in their official capacities are 'persons' under § 1983." See Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989). However, when a plaintiff seeks injunctive relief, the state official acting in an official capacity is a person under § 1983, id. at 71 n.10, and "official-capacity actions for prospective relief are not treated as actions against the State," Kentucky v. Graham, 473 U.S. 159, 167 n.14 (1985) (citing Ex parte Young, 209 U.S. 123 (1908)). "Under Ex parte Young, private citizens may sue state officials in their official capacities in federal court to obtain prospective

relief from ongoing violations of federal law." <u>Allen v. Cooper</u>, 895 F.3d 337, 354 (4th Cir. 2018). The plaintiff bears the burden "to establish an <u>ongoing</u> violation of federal law to qualify for relief under <u>Ex parte Young</u>." <u>Id.</u> at 355. The Fourth Circuit "has held that this exception 'does not apply when the alleged violation of federal law occurred entirely in the past.'" <u>Wicomico Nursing Home v. Padilla</u>, 910 F.3d 739, 747 (4th Cir. 2018) (quoting <u>DeBauche v. Trani</u>, 191 F.3d 499, 505 (4th Cir. 1999)).

Put another way, the <u>Ex parte Young</u> exception requires Plaintiffs to show "(1) the violation for which relief is sought is an ongoing one, and (2) the relief sought is only prospective." <u>Republic of Paraguay v. Allen</u>, 134 F.3d 622, 627 (4th Cir. 1998). "In determining whether the doctrine of <u>Ex parte Young</u> avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." <u>Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.</u>, 535 U.S. 635, 645 (2002) (alteration in original) (quoting <u>Idaho v. Coeur d'Alene Tribe of Idaho</u>, 521 U.S. 261, 296 (1977)).

In <u>Allen</u>, the plaintiffs sued the defendants for infringing their copyrights. 895 F.3d at 345. Prior to a hearing on the

defendants' motion to dismiss, the defendants provided the court with documentary evidence confirming that they had ceased infringing the plaintiffs' copyrights. Id. The district court nevertheless found individual defendants were not entitled to Eleventh Amendment immunity, and the defendants appealed. Id. at 346. On appeal, the plaintiffs argued they were entitled to sue the individual defendants in their official capacities for injunctive and declaratory relief under Ex parte Young. Id. at 354. The Fourth Circuit disagreed, reasoning that the prospective relief the plaintiffs sought "relie[d] on the asserted possibility that North Carolina w[ould] resume infringing [one of the plaintiff's] copyrights," which "conflate[d] the Ex parte Young exception with the doctrine of mootness." Id. at 355. "Because the only ongoing infringement that [the plaintiffs] plausibly alleged ha[d] concededly ended," the Fourth Circuit held that the plaintiffs could not "employ the Ex parte Young exception to address their fear of future infringements." Id.

Here, Plaintiffs have alleged their procedural due process rights were violated when Defendants reported Plaintiffs' clinical privileges were permanently revoked to the NPDB. (See Compl. (Doc. 1) ¶ 130.) However, following the hearing before this court, during which UNC-Health Defendants' counsel advised

- 23 -

this court that the communication to the NPDB was erroneous in that it communicated that Plaintiffs' privileges had been permanently revoked when that had not occurred, UNC-Health Defendants filed a Notice informing this court that "[o]n May 10, 2022, UNC Hospitals submitted a correction report to the NPDB changing the entry in the 'Length of Action' field from 'Permanent' to 'Indefinite.'" (Doc. 31 ¶ 3.)

Plaintiffs responded to the Notice, (see Doc. 32), and argue that "Defendants' change in 'Length of Action' is insufficient to remedy the due process violation that triggered this lawsuit," (id. ¶ 1). Plaintiffs contend the "use of the term 'revocation' conflicts with [Defendants'] position during oral argument." (Id. ¶ 3.) Additionally, Plaintiffs take issue with the representation on the NPDB report "that the alleged misconduct affected 'clinical care.'" (Id. ¶ 4.)

This court finds Plaintiffs' argument unpersuasive. Regardless of whether the status of Plaintiffs' clinical privileges is labeled a revocation or suspension, the status is not permanent until the Board of Directors meets and makes a final determination. (See Doc. 18-1 at 30-31.) Under the Bylaws, only the Board of Directors can make a permanent change to Plaintiffs' clinical privileges. (Id.)

- 24 -

This court further finds that the fact the NPDB report indicates Plaintiffs' alleged conduct affected clinical care is not "expressly refut[ed]" by Defendants' HR investigation, contrary to Plaintiffs' argument. (See Doc. 32 ¶ 4.) For one, the term "clinical care" is broad and by its ordinary meaning encompasses more than just patient care. Dr. Ivester's letters to Plaintiffs explaining MSEC's recommendation explained that the HR Report and MSEC's Ad Hoc committee report "document patterns of unprofessional conduct deemed to be detrimental to patient care and disruptive to the care environment." (See, e.g., Doc. 18-14 at 2 (emphasis added).) More importantly, Plaintiffs have presented no evidence that it was inappropriate for MSEC to consider the allegations related to patient care. Plaintiffs quibble with the semantics of the report to the NPDB but have presented no evidence from which this court could determine that the report contains patently false information. That may turn out to be the case one Plaintiffs assert a defense at any future hearing, but these facts are not before this court presently.

As a result of UNC-Health's voluntary actions in amending the notice to the NPDB, Plaintiffs' liberty interest claim, which was initially ripe, is now moot. Like the defendants in Allen, UNC-Health Defendants have provided reasonable assurances

to this court that it will not communicate erroneous information in the future to the NPDB. This court has considered whether the voluntary cessation exception to mootness applies, and under these circumstances, it does not appear to this court that the exception applies. Having represented to this court that the communication to the NPDB was an error when Plaintiffs' privileges have not yet been permanently revoked, it is difficult to conceive UNC-Health Defendants would repeat that conduct in the future. See Allen, 895 F.3d at 355 (reasoning that it was the plaintiffs' burden to establish an ongoing violation of federal law to qualify for relief under Ex parte Young, and because the ongoing challenged actions had ended, the plaintiffs could not sue the defendants in their official capacities). Under the foregoing analysis, Dr. Ivester and Hadar are subject to sovereign immunity. As a result, Plaintiffs' motion for a preliminary injunction will be denied as to these Defendants.[5]

---

[5] To the extent Plaintiffs seek to enjoin Defendants from communicating any information to the NPDB, that argument fails in light of UNC-Health Defendants' duty to report to the NPDB under federal law. See 42 U.S.C. § 11133; see also infra Section V.B.

## C. **Ripeness**

Defendants contend Plaintiffs' alleged constitutional violation claim is not yet ripe, in effect conceding Plaintiffs are entitled to a due process hearing prior to a final determination on revocation of clinical privileges. (See Defs.' MTD Br. (Doc. 17) at 16–19.) Plaintiffs contend their privileges have been permanently revoked without provision of a due process hearing, and therefore their claim for injunctive relief is ripe. (Pls.' MTD Resp. (Doc. 22) at 17–19.)

This court finds the following facts.

The Bylaws of the Medical Staff University of North Carolina Hospitals specify procedures for corrective action, hearing, and appellate review as to all physicians who are members of the Active, Courtesy, Affiliate, or Honorary Staff. (Doc. 18-1 at 5-6, 27-36.) The Bylaws "describe the fundamental principles of Medical Staff self-governance and accountability to the Governing Body." (Id. at 6.) As relevant to this case, the Bylaws specify the procedures for corrective action in Article VI. (Id. at 27-31.) Stated generally, a request for corrective action is forwarded to the President, an Ad Hoc committee is appointed to investigate, and following the investigation, a report is sent to the MSEC. (Id. at 28.) The MSEC may adopt, reject, or modify the recommendations of the Ad

Hoc committee. (Id. at 30.) The MSEC's recommendation is
provided to the Board of Directors, the President, the Medical
Staff Member, and the Chair of the Medical Staff Member's
Department. (Id.)

The Bylaws further provide that a "Medical Staff member is
entitled to a Hearing before a committee of the Medical Staff
when . . . MSEC . . . is recommending that any of the following
actions be taken" including the "restriction, denial, reduction,
suspension, or revocation of clinical privileges." (Id. at 31.)

If a Medical Staff member requests a hearing, the Bylaws
establish the process by which a hearing proceeds. (Id. at 32–
35.)

It is not genuinely disputed, and this court finds for
purposes of this motion, that these processes have been followed
by staff at UNC Hospitals, including the Ad Hoc investigation,
notice to Plaintiffs, report to MSEC, recommendations by MSEC,
and a report to the Board of Directors. It is not disputed that
Plaintiffs have both requested a hearing in accordance with the
terms of the Bylaws. The only issue is whether Plaintiffs'
clinical privileges have been revoked permanently, such that a
due process violation has occurred in the absence of a due
process hearing prior to permanent revocation.

This court finds that Plaintiffs' clinical privileges have been suspended solely on an interim basis pending a final decision by the Board of Directors, all in accordance with Article VI, Section 1(m). (See id. at 30.) This interim suspension, standing alone, is not sufficient to invoke due process rights. See Braswell v. Haywood Reg'l Med. Ctr., 234 F. App'x 47, 49, 54–55 (4th Cir. 2007) (holding that a summary suspension of the plaintiff's surgical privileges before a formal hearing did not violate the plaintiff's procedural due process rights); Darlak v. Bobear, 814 F.2d 1055, 1062–64 (5th Cir. 1987) (noting that "the private interest at stake" in an "interim suspension pending investigation" "is relatively minor," and holding the Due Process Clause was not violated when a doctor's privileges were temporarily suspended when "[a] full investigation was conducted" post-suspension, and the doctor "was allowed to address the Committee" and present witnesses and evidence as well as appeal the recommendation of the Committee); Caine v. Hardy, 943 F.2d 1406, 1411–12 (5th Cir. 1991) (holding process afforded to doctor before privileges were suspended, specifically that the doctor had the opportunity to defend himself before the Ad Hoc Investigating Committee prior to his temporary suspension and had the opportunity to a formal post-suspension hearing comported with Due Process Clause).

This court finds that a due process hearing is proceeding, and it is not only likely, but almost certain, that Plaintiffs will receive process and a hearing in accordance with the Bylaws.[6] At this preliminary stage of the proceedings, Plaintiffs fail to show that they will not receive the process set forth in the Bylaws, or that the process will be deficient in some fashion, or that a constitutional claim is ripe for adjudication.

This court therefore finds this claim—as to permanent revocation and failure to provide due process prior to permanent revocation—is not ripe. The motion for preliminary injunction generally will be denied as not ripe. Again, these subject matter jurisdiction issues will be more specifically addressed in an order addressing Defendants' motion to dismiss.

Notwithstanding the foregoing analysis, this court will analyze the merits of Plaintiffs' motion for a preliminary injunction, bearing in mind that these subject matter jurisdiction issues are sufficient to require denial of Plaintiffs' requested injunctive relief.

---

[6] This statement does not imply, and should not be understood to suggest, that any such process and hearing would comply with due process. Instead, this statement simply recognizes there are procedures in place to provide for a hearing, and Plaintiffs have both requested a hearing. At present, there is no evidence any such hearing would not comply with due process.

## V. <u>**PRELIMINARY INJUCTION ANALYSIS**</u>

"A plaintiff seeking a preliminary injunction must establish" four prongs: "that [1] he is likely to succeed on the merits, that [2] he is likely to suffer irreparable harm in the absence of preliminary relief, that [3] the balance of equities tips in his favor, and that [4] an injunction is in the public interest." <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 20 (2008). Plaintiffs must "make a 'clear showing'" of these pre-requisites. <u>Pashby v. Delia</u>, 709 F.3d 307, 321 (4th Cir. 2013) (quoting <u>The Real Truth About Obama, Inc., v. FEC</u>, 575 F.3d 342, 345 (4th Cir. 2009), <u>vacated on other grounds</u>, 559 U.S. 1089). Such an injunction "is an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit." <u>Di Biase v. SPX Corp.</u>, 872 F.3d 224, 230 (4th Cir. 2017).

To demonstrate a likelihood of success on a claim, a "plaintiff need not establish a 'certainty of success,' but must make a clear showing that he is likely to succeed at trial." <u>Di Biase</u>, 872 F.3d at 230 (quoting <u>Pashby</u>, 709 F.3d at 321). Plaintiffs allege Defendants violated 42 U.S.C. § 1983 by

denying them their Fourth Amendment Due Process rights. (Compl. (Doc. 1) ¶¶ 110–33.)

The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. Section 1983 makes it unlawful for a person, under color of law, to subject another person "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. To establish their procedural due process claim, Plaintiffs must show: (1) that they had a protected property or liberty interest; (2) of which Defendants deprived them; (3) without due process of law. See Tri Cnty. Paving, Inc. v. Ashe Cnty., 281 F.3d 430, 436 (4th Cir. 2002).

In addition to a likelihood of success on the merits, a plaintiff seeking a preliminary injunction must also make a "clear showing that it is likely to be irreparably harmed absent preliminary relief." Real Truth About Obama, 575 F.3d at 347. Irreparable harm is suffered "when monetary damages are difficult to ascertain or are inadequate." Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 551 (4th Cir. 1994) (internal quotation marks omitted) (quoting Danielson v. Local 275, 479 F.2d 1033, 1037 (2d Cir.

- 32 -

1973)). "The plaintiff must demonstrate a <u>likelihood</u> of irreparable harm without a preliminary injunction; a mere <u>possibility</u> of harm will not suffice." <u>Williams v. Rigg</u>, 458 F. Supp. 3d 468, 474 (W.D. Va. 2020).

The third preliminary injunction prong requires that this court determine whether "the balance of equities tips in [Plaintiffs'] favor." <u>Winter</u>, 555 U.S. at 20. This requires assessment of "the harm Defendants will suffer if Plaintiff[s'] motion is granted." <u>Int'l Lab. Mgmt. Corp. v. Perez</u>, No. 1:14CV231, 2014 WL 1668131, at *14 (M.D.N.C. Apr. 25, 2014).

The final prong that Plaintiffs must establish is that "an injunction is in the public interest." <u>Winter</u>, 555 U.S. at 20. It is always in the public interest to uphold constitutional rights." <u>B.P.J. v. W. Va. State Bd. of Educ.</u>, 550 F. Supp. 3d 347, 357 (W.D. Va. 2021) (citing <u>Centro Tepeyac v. Montgomery Cnty.</u>, 722 F.3d 184, 191 (4th Cir. 2013)) (finding "[i]t [was] clearly in the public interest to uphold [the plaintiff's] constitutional right not to be treated any differently than her similarly situated peers"); <u>see also</u> <u>Leaders of a Beautiful Struggle v. Balt. Police Dep't</u>, 2 F.4th 330, 346 (4th Cir. 2021)

(recognizing that "the public interest favors protecting constitutional rights").

Plaintiffs seek two categories of requested relief. The first category is regarding the revocation of their clinical privileges, administrative titles, and salaries. (Doc. 2 at 5-6.) The second category is regarding Defendants' communication to the NPDB that Plaintiffs' privileges have been permanently revoked. (Id. at 6.)

## A. **Revocation of Clinical Privileges, Administrative Titles, and Salaries**

The first category of relief Plaintiffs seek is reinstatement of their clinical privileges, administrative titles, and salaries. (Doc. 2 at 5-6.)

### 1. **Likelihood of Success on the Merits**

This court finds Plaintiffs have not demonstrated a likelihood of success on the merits of a § 1983 procedural due process claim as to their clinical privileges, administrative titles, or salaries. First, as to their administrative titles and salaries, neither is a recognized property interest subject to the protections of the Due Process Clause. See Cominelli v. The Rector & Visitors of the Univ. of Va., 589 F. Supp. 2d 706, 713 (W.D. Va. 2008) (recognizing that "intra-departmental demotions . . . do not implicate property interests subject to the protections of the Due Process Clause"); Crosby v. Univ. of Ky.,

- 34 -

863 F.3d 545, 552 (6th Cir. 2017) (holding that tenured university professors do not have a constitutionally protected interest in their administrative posts); Henry-Davenport v. Sch. Dist. of Fairfield Cnty., 832 F. Supp. 2d 602, 603 (D.S.C. 2011) (granting the motion for summary judgment as to the plaintiff's § 1983 procedural due process claim because "Plaintiff has no legal entitlement to the administrative position or salary of Deputy Superintendent" because "[t]he fact the School District reduced Plaintiff's administrative salary without affording her a hearing did not violate the Fourteenth Amendment").

Second, Plaintiffs cannot demonstrate a likelihood of success on the merits of a § 1983 procedural due process claim as to their clinical privileges because of ripeness issues. "The doctrine of ripeness prevents judicial consideration of issues until a controversy is presented in 'clean-cut and concrete form.'" Miller v. Brown, 462 F.3d 312, 318–19 (4th Cir. 2006) (quoting Rescue Army v. Mun. Court of L.A., 331 U.S. 549, 584 (1947)). To determine whether the case is ripe, courts "balance 'the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration.'" Franks v. Ross, 313 F.3d 184, 194 (4th Cir. 2002) (quoting Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 733 (1998)). A case is fit for judicial decision when the issues are purely legal

and when the action in "controversy is final and not dependent on future uncertainties." Charter Fed. Sav. Bank v. Off. of Thrift Supervision, 976 F.2d 203, 208 (4th Cir. 1992). "The hardship prong is measured by the immediacy of the threat and the burden imposed on the [plaintiffs] who would be compelled to act under threat of enforcement of the challenged law." Id. at 208-09. When considering hardship, courts may consider the cost to the parties of delaying judicial review. See Fort Sumter Tours, Inc. v. Andrus, 564 F.2d 1119, 1124 (4th Cir. 1977).

Plaintiffs' claim as to their clinical privileges is not ripe for review because the internal hearing and appeals process is ongoing. Here, MSEC recommended Plaintiffs' clinical privileges be permanently revoked, which would be subject to final decision by the Board of Directors after the hearing and appeals process outlined in Article VII of the Bylaws. (See Doc. 18-14 at 3; Doc. 18-16 at 3; Doc. 18-1 at 31-36.) In the interim, MSEC immediately revoked Plaintiffs' privileges until that hearing and appeals process was completed in accordance with MSEC's authority under the Bylaws. (Doc. 18-14 at 3; Doc. 18-16 at 3; Doc. 18-1 at 30 (authorizing MSEC's recommendation of revocation to "become effective immediately if MSEC determines that the failure to act may result in imminent danger to the health of any individual, subject to reversal by

the Board of Directors").) Plaintiffs have exercised their right to a hearing, (Docs. 18-19, 18-20), and Defendants are ready to proceed with such hearing, (Ivester Decl. (Doc. 18) ¶¶ 21-22; Doc. 23-3). Because the status of Plaintiffs' clinical privileges is not final and is dependent on the outcome of the hearing and appeals process, Plaintiffs' claim as to their clinical privileges is not ripe for review. See Charter Fed. Sav. Bank, 976 F.2d at 208. Plaintiffs have failed to forecast a likelihood of success on the merits of their procedural due process claim as to their clinical privileges because this claim is not ripe. Accordingly, this first factor weighs in favor of Defendants.

### 2. **Risk of Irreparable Harm**

Additionally, Plaintiffs fail to demonstrate they are at risk of irreparable harm absent injunctive relief. First, Plaintiffs' potential loss of earnings does not constitute irreparable harm.

> The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against [Plaintiffs'] claim of irreparable harm.

Sampson v. Murray, 415 U.S. 61, 90 (1974) (quoting Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n, 259 F.2d 921, 925 (D.C. Cir.

1958)). Plaintiffs' Complaint includes a claim for money damages
under § 1983 against several Defendants in their individual
capacities. (Compl. (Doc. 1) ¶ 133.) If Plaintiffs ultimately
prevail on the merits, they may be awarded damages for their
lost earnings. See Weathers v. Univ. of N.C. at Chapel Hill, No.
1:08CV847, 2008 WL 5110952, at *1-2, 4 (M.D.N.C. Dec. 4, 2008)
(finding no irreparable harm where the plaintiff was denied
reappointment and promotion to a tenured position within the
Department of Maternal and Child Health at UNC-CH).

Second, as to Plaintiffs' revocation of clinical privileges
and administrative titles, that harm is not irreparable because,
should Plaintiffs prevail on their claim, their privileges and
administrative titles may be reinstated. When a plaintiff's
title or privilege, such as tenure, can be reinstated at the
conclusion of a lawsuit, the revocation of that title or
privilege is not irreparable harm. See id. at *4. Thus,
revocation of Plaintiffs' clinical privileges, administrative
titles, and salaries are not irreparable harms.

### 3. **Balance of the Equities**

Even assuming, arguendo, that Plaintiffs presented some
evidence of irreparable harm, the balance of equities does not
appear in Plaintiffs' favor, especially considering that based
on the evidence presently before this court, Plaintiffs are not

likely to prevail on the merits as to this first category of requested relief. See id. at *5.

UNC-Health Defendants argue "restoring clinical privileges and allowing Plaintiffs to return to work would severely disrupt the operations of the Neuropathology lab and potentially cause harm to clinical staff." (UNC-Health Defs.' Br. (Doc. 19) at 30.) Reinstatement would also have a chilling effect on future staff reports of professional misconduct. (Id.) UNC-CH Defendants argue that Plaintiffs have not shown how loss of administrative titles created any hardship for them, and any hardship from reduced salary can easily be corrected if Plaintiffs' claim ultimately succeeds. (UNC-CH Defs.' Br. (Doc. 20) at 23-24.) They also argue they would face great hardship if required to pay Plaintiffs for work they are not performing, and that it would be burdensome to have Plaintiffs return to administrative roles where they would be supervising employees who have just been relieved from the traumatic work environment Plaintiffs created. (Id. at 24.)

Plaintiffs counter that "Defendants had no authority to terminate their respective clinical privileges without a meaningful hearing" and "[t]he requested injunction will only bar Defendants from proceeding on their actions which were forbidden in the first place." (Pls.' Br. (Doc. 3) at 13-14.) On

- 39 -

the other hand, Plaintiffs argue they face irreparable harm due to the revocation of their clinical privileges. (Id. at 14.)

Contrary to Plaintiffs' argument that "Defendants had no authority to terminate their respective clinical privileges without a meaningful hearing," (id. at 13), Defendants had the authority under the Bylaws to immediately suspend Plaintiffs' clinical privileges, which could become permanent after Plaintiffs exercised their hearing and appeals rights, and the Board adopted the recommendations, (see Doc. 18-1 at 30). Additionally, contrary to Plaintiffs' argument that "Defendants can show no harm in restoring the Plaintiffs' physician privileges," (Pls.' Br. (Doc. 3) at 14), the HR Report and investigation belies that argument. Many of Plaintiffs' coworkers were hesitant to participate in the investigation for fear of retaliation by Plaintiffs. (See, e.g., Doc. 3-3 at 3-4.) If this court enjoined Defendants from revoking Plaintiffs' clinical privileges, the employees who participated and revealed, according to Voss and Hoar, credible instances of abusive and harassing behavior, would be forced to work with Plaintiffs.

Considering there is little, if any, irreparable harm to Plaintiffs in denying an injunction, and significant potential harm to innocent third parties if Plaintiffs' physician

privileges are restored, this factor weighs in Defendants'
favor.

### 4. **Public Interest**

Finally, this court finds the public interest in granting
Plaintiffs' motion as to the first category of requested relief
lies with Defendants.

UNC-Health Defendants argue "the public has a strong
interest in encouraging hospitals to improve the quality of
medical care through the peer review process," and therefore,
the public interest is served by not enjoining Defendants. (UNC-
Health Defs.' Br. (Doc. 19) at 30.) UNC-CH Defendants argue that
the public interest lies with not enjoining Defendants because
Defendants' decisions were made to protect the public at large
from unsafe Plaintiffs and their effect on patient care. (UNC-CH
Defs.' Br. (Doc. 20) at 24.)

Plaintiffs argue that "[t]he public has an interest in
upholding an enforcing an individual's due process rights as set
forth in 42 U.S. Code § 1983." (Pls.' Br. (Doc. 3) at 14.) This
argument essentially restates a likelihood of success on the
merits argument. Indeed, the case law cited by Plaintiffs in
support of their argument specifically chastised the district
court for not giving additional reasoning for why the plaintiff
had satisfied the public interest factor other than that the

plaintiff was likely to succeed on the merits. See Pashby, 709
F.3d at 329.

Here, the public interest favors denying preliminary
injunctive relief. Defendants have put forth evidence that
Plaintiffs' actions were damaging not only to other doctors and
medical staff, but to patients as well, because their biopsy
results were delayed as a result of Plaintiffs' refusal to
communicate with certain doctors. (See Doc. 3-3 at 5-14.)
Plaintiffs, on the other hand, have not made a clear showing
that the public interest lies with this court granting a
preliminary injunction as to their first category of requested
relief. Accordingly, this factor weighs in Defendants' favor.

In conclusion, each Winter factor weighs in Defendants'
favor as to the first category of requested relief. Accordingly,
this court will deny Plaintiffs' motion for a preliminary
injunction as to revocation of Plaintiffs' clinical privileges,
administrative titles, and salaries.

### B. Communication about Revocation of Privileges to the NPDB

The second category of relief Plaintiffs seek is for
Defendants to "retract all statements/reports/notifications made
to the National Practitioner Data Bank," (Doc. 2 at 6),
specifically that Defendants communicated to the NPDB that
Plaintiffs' clinical privileges had been permanently revoked,

- 42 -

(see Doc. 3-9 at 3; Doc. 3-10 at 3). As will be explained, for several reasons, injunctive relief as to Defendants' statements to the NPDB is not proper.

### 1. Likelihood of Success on the Merits

Plaintiffs argue they have a liberty interest in their reputation and choice of occupation, which was deprived without due process when Defendants communicated to the NPDB that Plaintiffs' privileges had been permanently revoked. (See Pls.' UNC-Health Reply (Doc. 23) at 9–10.) At the time Defendants initially communicated the status of Plaintiffs' privileges to the NPDB, that communication was false because Plaintiffs' privileges have not been permanently revoked; they have been temporarily revoked pending the outcome of the internal hearing and appeals process. (See Docs. 18-14, 18-16; accord Doc. 18-1 at 30.) If it should turn out a claim exists as to Defendants' initial erroneous reporting to the NPDB, that appears to be a matter that can be addressed by damages considering the report to the NPDB is no longer erroneous as to the status of Plaintiffs' privileges. Any injunctive relief to correct the falsity of the initial report to the NPDB is moot, and therefore Plaintiffs cannot demonstrate a likelihood of success.

Additionally, UNC-Health Defendants have remedied the false communication on their own, (see Doc. 31), and now the

- 43 -

communication to the NPDB likely accurately describes the status of Plaintiffs' privileges. For several reasons, Plaintiffs cannot demonstrate a likelihood of success on the merits of a procedural due process liberty interest claim based on the now-corrected report to the NPDB. The Fourth Circuit has held that a communication to the NPDB does not deprive an individual of his liberty interest to practice his profession free from an imposed stigma. See Randall v. United States, 30 F.3d 518, 522 (4th Cir. 1994) (reasoning that while an NPDB report is an "action which inflicts a stigma on the reputation of a plaintiff causing that plaintiff hardship in obtaining employment," it "does not rise to the level of a constitutional deprivation"). Thus, Plaintiffs cannot demonstrate a likelihood of success on the merits because they have not been deprived of a cognizable liberty interest.

Plaintiffs cannot demonstrate a likelihood of success on the merits as to their liberty interest for a separate reason. As discussed, this court finds the Ex parte Young exception inapplicable given there is no ongoing harm related to a false NPDB report, and therefore there is no individual Defendant for this court to enjoin. See discussion supra Section IV.B.

Moreover, there is no dispute UNC-Health had the authority to impose an interim suspension under the Bylaws. (See Doc. 18-1 at 30.) Once an interim suspension is imposed, Plaintiffs have

- 44 -

failed to demonstrate that UNC-Health can withhold reporting that interim suspension to the NPDB because federal law requires them to report such actions. See 42 U.S.C. § 11133. This court cannot impose a preliminary injunction requiring Defendants to act contrary to a constitutional federal law, as it would certainly not be in the public interest to order a defendant to act unlawfully.

For these reasons, this court finds Plaintiffs fail to demonstrate a likelihood of success on the merits of their procedural due process liberty interest claim arising out of Defendants' communication to the NPDB, and therefore this first factor weighs against injunctive relief.

### 2. Risk of Irreparable Harm

This court further finds Plaintiffs have failed to demonstrate, as to their second category of requested relief, that they are at risk of irreparable harm absent injunctive relief. If Defendants had not, on their own, corrected the erroneous report to the NPDB, then perhaps Plaintiffs would be facing a risk of irreparable harm with the stigma of a false report about their clinical privileges. However, there is no longer any false information communicated to the NPDB, as Defendants have fixed their report to indicate Plaintiffs' privileges have been suspended for an indefinite period of time.

- 45 -

(See Doc. 31.) Should Plaintiffs ultimately prevail on a due process claim as to the initial erroneous reporting, this court finds that damages will be adequate to address the damage to Plaintiffs' reputation for the period of time there was a false communication to the NPDB. Cf. Weathers, 2008 WL 5110952, at *4.

### 3. Balance of the Equities and Public Interest

This court further finds the balance of the equities and public interest favor Defendants as to the communication to the NPDB about the status of Plaintiffs' privileges. If this court were to enter injunctive relief enjoining Defendants from making any report to the NPDB concerning the status of Plaintiffs' privileges, this court would be ordering Defendants to violate their duties under federal law. Thus, Defendants face significant harm at the prospect of being enjoined from fulfilling their obligation to make reports concerning the status of Plaintiffs' clinical privileges. Furthermore, the public interest lies with ensuring Defendants are fulfilling their obligations under federal law. Therefore, these final two factors weigh against injunctive relief.

In conclusion, each Winter factor weighs against granting the second category of requested relief. Accordingly, this court will deny Plaintiffs' motion for a preliminary injunction as to

Defendants' communication to the NPDB about Plaintiffs' clinical privileges.

VI.  **CONCLUSION**

For the foregoing reasons, this court concludes that Plaintiffs have failed to show a likelihood of success on the merits of their § 1983 procedural due process claim, that Plaintiffs will not suffer irreparable harm in the absence of a preliminary injunction, and that the balance of equities and public interest weighs against granting a preliminary injunction.

**IT IS THEREFORE ORDERED** that UNC-Health Defendants' Motion for Leave to File Sur-Reply, (Doc. 26), is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiffs' motion for preliminary injunction as requested in Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction, (Doc. 2), is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiffs' motion for a temporary restraining order as requested in Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction, (Doc. 2), is **DENIED** as moot.

This the 12th day of May, 2022.

_William L. Osteen, Jr._
United States District Judge