IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| HARSHARAN KAUR SINGH, M.D. and VOLKER REINHOLD AUGUST NICKELEIT, M.D., | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, UNIVERSITY OF NORTH CAROLINA HEALTH CARE SYSTEM d/b/a UNC HEALTH CARE, UNIVERSITY OF NORTH CAROLINA SCHOOL OF MEDICINE, JANET HADAR, MSN, in her official capacity, THOMAS S. IVESTER, M.D., individually and in his official capacity, RUSSELL BROADDUS, M.D., individually and in his official capacity, LISA VOSS, individually and in her official capacity, DEREK V. HOAR, individually and in his official capacity, and HARVEY L. LINEBERRY, PhD., individually and in his official capacity, | ) ) ) ) ) ) ) ) 1:22-cv-294 ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

**OSTEEN, JR., District Judge**

   Before this court is a Motion to Dismiss pursuant to

Federal Rule of Civil Procedure 12(b)(1) filed by Defendants the

University of North Carolina at Chapel Hill ("UNC-CH"), the

University of North Carolina Health Care System d/b/a UNC Health Care ("UNC-Health"), the University of North Carolina School of Medicine ("UNC-SOM"), (collectively "University Defendants"), Janet Hadar, MSN, Thomas S. Ivester, M.D., Russell Broaddus, M.D., Lisa Voss, Derek V. Hoar, and Harvey L. Lineberry, Ph.D. (collectively "Individual Defendants"). (Doc. 16.) For the reasons provided herein, this court will grant Defendants' Motion to Dismiss.

## I.   <u>FACTUAL BACKGROUND</u>

The facts, as stated in this court's prior Memorandum Opinion and Order and supplemented where necessary, are as follows. (<u>See</u> Mem. Op. and Order (Doc. 36) at 4–7.)[1] UNC-CH is a public university in North Carolina. (<u>See</u> Compl. (Doc. 1) ¶ 14.) UNC-CH is comprised of various institutions of higher education, including UNC-SOM. (<u>Id.</u>) Dr. Lineberry is the Associate Dean of Human Resources at UNC-SOM. (<u>Id.</u> ¶ 22.) Hoar and Voss are human resources employees at UNC-SOM. (<u>Id.</u> ¶¶ 20–21.) Dr. Broaddus is Chair of the Pathology and Laboratory Medicine Department at UNC-SOM. (<u>Id.</u> ¶ 19.)

---

[1] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

UNC-Health is an integrated health care system owned by North Carolina and administered as an affiliate enterprise of UNC-CH. (Id. ¶ 15.) It consists of UNC Hospitals and its provider network, the clinical program of the UNC-SOM, and affiliate hospitals throughout the state. (Id.) Hadar is the President of UNC Hospitals, and Dr. Ivester is the Chief Medical Officer at UNC Hospitals. (Id. ¶¶ 17-18.)

Plaintiffs are tenured professors of pathology at UNC-CH. (See id. ¶¶ 12-13.)

In the fall of 2020, UNC-SOM's Human Resources Office received complaints about Plaintiffs. (Id. ¶ 52.) The Human Resources Office engaged in a lengthy investigation into the allegations, including interviewing Plaintiffs. (See Ex. C, HR Report Singh ("Singh HR Report") (Doc. 3-3) at 2-3; Ex. D, HR Report Nickeleit ("Nickeleit HR Report") (Doc. 3-4) at 2-3; Compl. (Doc. 1) ¶¶ 61, 63-66.)[2] The Human Resources Office

_____

[2] Normally, when considering a motion to dismiss, a court cannot look to matters beyond the complaint without converting the motion into one for summary judgment. Fed. R. Civ. P. 12(d). However, "a court may consider official public records, documents central to plaintiff's claim, and documents sufficiently referred to in the complaint so long as the authenticity of these documents is not disputed." Witthohn v. Fed. Ins., 164 F. App'x 395, 396 (4th Cir. 2006). Here, this court may consider official documents outlining institutional policies, reports generated during Defendants' investigations, and exchanges between the parties, which are expressly referred to in the complaint. (See Compl. (Doc. 1) ¶¶ 52-95, 98-102.)

- 3 -

finished its investigation on January 21, 2022, and sent out the report (the "HR Report"). (Compl. (Doc. 1) ¶ 55.) Dr. Ivester and Dr. Broaddus both received the HR Report. (See Doc. 18-2.) According to the HR Report, many individuals interviewed were concerned about retaliation by Plaintiffs, and some chose not to participate for that reason. (Singh HR Report (Doc. 3-3) at 3-4; Nickeleit HR Report (Doc. 3-4) at 3-4.)

Subsequently, UNC Hospital/SOM's Professional Executive Committee requested that corrective action be taken by the Medical Staff Executive Committee ("MSEC"). (Compl. (Doc. 1) ¶ 68.) MSEC formed an Ad Hoc Committee to investigate based on the HR Report. (Id. ¶ 70; Decl. of Thomas S. Ivester, MD ("Ivester Decl.") (Doc. 18) ¶¶ 4-5, 7.) Plaintiffs met with the Ad Hoc Committee on February 10, 2022. (Compl. (Doc. 1) ¶ 76.) The Ad Hoc Committee submitted its report and recommendation to MSEC on March 3, 2022. (Id. ¶ 85; Ivester Decl. (Doc. 18) ¶ 10; Doc. 3-5; Doc. 3-6.) MSEC then scheduled a special meeting for March 7, 2022. (Compl. (Doc. 1) ¶ 85-86.) Plaintiffs were given notice of the meeting and the opportunity to attend and speak or provide written statements. (Docs. 18-7, 18-8.) Plaintiffs provided written statements. (Ivester Decl. (Doc. 18) ¶ 12; Doc. 18-9; Doc. 18-10; Doc. 18-11.)

- 4 -

At the March 7 meeting, MSEC voted to recommend the Board of Directors revoke Plaintiffs' clinical privileges, and also to immediately revoke their privileges pending final decision by the Board of Directors upon conclusion of the hearing and appeals process. (See Ex. 14, 8 March 2022 Email to Nickeleit w/ Attachments ("March 2022 Email to Nickeleit") (Doc. 18-14); (Ex. 16, 8 March 2022 Email to Singh w/ Attachments ("March 2022 Email to Singh") (Doc. 18-16).) The immediate, interim revocation was issued by MSEC allegedly due to concerns about potential impact on other individuals. (Ivester Decl. (Doc. 18) ¶¶ 13, 15; (March 2022 Email to Nickeleit (Doc. 18-14); March 2022 Email to Singh (Doc. 18-16).) The next day, Dr. Ivester sent Plaintiffs letters providing formal notice of corrective action. (March 2022 Email to Nickeleit (Doc. 18-14); March 2022 Email to Singh (Doc. 18-16).) The letters stated that "[p]ursuant to Article VI, Section 1(l) of the UNC Hospitals' Bylaws of the Medical Staff ('Bylaws')," MSEC "voted to recommend rescinding your appointment to the UNC Hospitals Medical Staff and revoking your clinical privileges at UNC Hospitals." (E.g., March 2022 Email to Nickeleit (Doc. 18-14) at 3.) The letter further stated that "[p]ursuant to Article I, Section 1(m)," the revocation of privileges "should become effective immediately after determining that a failure to act

- 5 -

may result in imminent danger to the health of individuals."
(E.g., id.) Dr. Ivester advised Plaintiffs of their "right to
request a Hearing" "pursuant to Article VII, Section 3 of the
Bylaws." (E.g., id.) He also included relevant portions of the
Bylaws. (E.g., id. at 4-12.)

On March 11, 2022, Plaintiffs each emailed Dr. Ivester
requesting a hearing. (Compl. (Doc. 1) ¶¶ 94, 96; Ivester Decl.
(Doc. 18) ¶ 17.) Additionally, on March 16, 2022, Defendants
reported the revocation of Plaintiffs' clinical privileges to
the National Practitioner Data Bank ("NPDB"). (Compl. (Doc. 1)
¶ 89; see also Ex. I, NPDB Singh ("Singh NPDB Report") (Doc. 3-
9); Ex. J, NPDB Nickeleit ("Nickeleit NPDB Report") (Doc. 3-
10).) The report indicated the revocation was permanent. (See
Singh NPDB Report (Doc. 3-9) at 3; Nickeleit NPDB Report (Doc.
3-10) at 3.)

This court subsequently held a hearing in which UNC-Health
Defendants "represented . . . that the communication to the NPDB
was an error." (Mem. Op. and Order (Doc. 36) at 26.) Defendants
later notified this court they "submitted a correction report to
the NPDB changing the entry in the 'Length of Action' field from
'Permanent' to 'Indefinite.'" (Notice Regarding Amendment of
NPDB Reports ("NPDB Amendment Notice") (Doc. 31) at 2.)

- 6 -

Dr. Ivester contends that since the time Plaintiffs requested individual hearings, UNC Hospitals personnel have been working diligently to identify six individuals appropriate to serve on the two hearing panels. (Ivester Decl. (Doc. 18) ¶ 21.) Those individuals have now been identified, and Plaintiffs have been contacted regarding the scheduling of their hearings. (Id. ¶¶ 21-22; see also Doc. 23-3.)

## II.  PROCEDURAL HISTORY

Plaintiffs filed their complaint on April 13, 2022 alleging a Fourteenth Amendment Due Process claim against Defendants. (Compl. (Doc. 1) ¶¶ 110-33.) On the same day, Plaintiffs also filed a motion for a temporary restraining order ("TRO"), (Doc. 2), which this court subsequently denied, (Mem. Op. and Order (Doc. 36)).

Defendants filed a motion to dismiss, (Defs.' Mot. to Dismiss Pursuant to Rule 12(b)(1) ("Defs.' MTD") (Doc. 16)), and a brief in support, (Defs.' Br. in Supp. of Mot. to Dismiss ("Defs.' MTD Br.") (Doc. 17)). Plaintiffs responded. (Pls.' Br. in Opp'n to Defs.' Mot. to Dismiss ("Pls.' MTD Resp.") (Doc. 22).) Defendants replied. (Defs.' Reply Br. in Supp. of Mot. to Dismiss ("Defs.' MTD Reply") (Doc. 28).) This motion is now ripe for adjudication.

- 7 -

# III. <u>STANDARD OF REVIEW</u>

Defendants move to dismiss the complaint for lack of subject matter jurisdiction. (Doc. 16.) Under Rule 12(b)(1), a party may seek dismissal based on the court's "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). Subject-matter jurisdiction is a threshold issue that relates to the court's power to hear a case and must be decided before a determination on the merits of the case. <u>Constantine v. Rectors & Visitors of Geo. Mason Univ.</u>, 411 F.3d 474, 479–80 (4th Cir. 2005). A motion under Rule 12(b)(1) raises the question of "whether [the plaintiff] has a right to be in the district court at all and whether the court has the power to hear and dispose of [the] claim." <u>Holloway v. Pagan River Dockside Seafood, Inc.</u>, 669 F.3d 448, 452 (4th Cir. 2012). The burden of proving subject matter jurisdiction rests with the plaintiff. <u>McNutt v. Gen. Motors Acceptance Corp. of Ind.</u>, 298 U.S. 178, 189 (1936); <u>Adams v. Bain</u>, 697 F.2d 1213, 1219 (4th Cir. 1982). When evaluating a Rule 12(b)(1) motion to dismiss, a court should grant the motion "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." <u>Richmond, Fredericksburg & Potomac R.R. Co. v. United States</u>, 945 F.2d 765, 768 (4th Cir. 1991).

IV. **ANALYSIS**

A. **University Defendants**

Defendants contend UNC-CH, UNC-SOM, and UNC-Health are immune from suit based on sovereign immunity. (Defs.' MTD Br. (Doc. 17) at 11-13.) Plaintiffs concede UNC-CH and UNC-SOM are immune from suit. (Pls.' MTD Resp. (Doc. 22) at 9.) Accordingly, Defendants' motion to dismiss will be granted as to UNC-CH and UNC-SOM.

Additionally, this court concluded that UNC-Health is a subdivision of the state entitled to Eleventh Amendment Immunity under the Ram Ditta factors when it ruled on Plaintiffs' motion for a TRO. (See Mem. Op. and Order (Doc. 36) at 11-20.) No new evidence has been presented to this court undermining that analysis. Therefore, this court will grant the motion to dismiss as to UNC-Health for the same reasons set forth previously and restated in full herein as follows.[3]

Plaintiffs argue UNC-Health is not an arm or alter ego of the State of North Carolina and therefore not immune from suit. (Pls.' MTD Resp. (Doc. 22) at 21-24.) The Eleventh Amendment to the Constitution "bars federal courts from exercising jurisdiction over suits against nonconsenting states or state

---

[3] For ease of reference, this court chooses to restate the applicable analysis rather than incorporate by reference from another order.

- 9 -

entities." Kadel v. N.C. State Health Plan for Teachers & State Emps., 12 F.4th 422, 428 (4th Cir. 2021). North Carolina has not consented to being sued under § 1983 and therefore has not waived sovereign immunity in that context. Cf. Huang v. Bd. of Governors of Univ. of N.C., 902 F.2d 1134, 1139 (4th Cir. 1990) (finding that the State has not waived immunity as it applies to the state university system). Nor has Congress overridden North Carolina's sovereign immunity in that context. See Jennings v. Univ. of N.C. at Chapel Hill, 240 F. Supp. 2d 492, 498 (M.D.N.C. 2002) ("Congress has not overridden [sovereign] immunity in any relevant area save for Title VII.").

State sovereign immunity bars suit not only against a state, but also against an instrumentality of a state, such as a state agency, often referred to as an "arm of the State." See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100, 124 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."). Sovereign immunity applies to a state subdivision when "the governmental entity is so connected to the State that the legal action against the entity would . . . amount to the 'indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties.'" Cash v.

- 10 -

Granville Cnty. Bd. of Educ., 242 F.3d 219, 224 (4th Cir. 2001)
(internal quotation marks omitted) (quoting Seminole Tribe of
Fla. v. Florida, 517 U.S. 44, 58 (1996)). On the other hand,
sovereign immunity "does not immunize political subdivisions of
the state, such as municipalities and counties, even though such
entities might exercise a 'slice of state power.'" Ram Ditta v.
Md. Nat. Cap. Park & Plan. Comm'n, 822 F.2d 456, 457 (4th Cir.
1987) (quoting Lake Country Estates, Inc. v. Tahoe Reg'l Plan.
Agency, 440 U.S. 391, 401 (1979)).

        To determine whether a state subdivision is entitled to
Eleventh Amendment immunity, the Fourth Circuit examines four
factors:

> (1) whether the state treasury will be responsible for
> paying any judgment that might be awarded; (2) whether
> the entity exercises a significant degree of autonomy
> from the state; (3) whether it is involved with local
> versus statewide concerns; and (4) how the entity is
> treated as a matter of state law.

Ristow v. S.C. Ports Auth., 58 F.3d 1051, 1052 n.3 (4th Cir.
1995) (citing Ram Ditta, 822 F.2d at 457–58); see also U.S. ex
rel. Oberg v. Pa. Higher Educ. Assistance Agency, 745 F.3d 131,
136–38 (4th Cir. 2014) (identifying and applying the "four
nonexclusive factors").

        The first Ram Ditta factor has been described as the most
important. See, e.g., Hess v. Port Auth. Trans-Hudson Corp., 513
U.S. 30, 49 (1994) (remarking that "the state treasury factor is

- 11 -

the most important factor to be considered"); <u>Hutto v. S.C. Ret.</u>
<u>Sys.</u>, 773 F.3d 536, 543 (4th Cir. 2014) (same). The Supreme
Court has observed that the first factor is "generally accorded
. . . dispositive weight." <u>Hess</u>, 513 U.S. at 49 (internal
quotation marks omitted). However, even when a court has
determined the first factor suggests the entity is an arm of the
state, courts often continue in analyzing the other factors.
<u>See, e.g.,</u> <u>McAdoo v. Univ. of N.C. at Chapel Hill</u>, 248 F. Supp.
3d 705, 713–19 (M.D.N.C. 2017).

Plaintiffs assert "[t]here is no evidence that any judgment
against UNC-Health would be paid out of the State treasury."
(Pls.' MTD Resp. (Doc. 22) at 23.) Defendants "acknowledge[]
that [UNC-Health] currently does not receive an annual
appropriation from the General Assembly," but contends that
"[a]lthough a judgment against UNC Health would not directly
impact the state treasury, it is possible . . . that if a
judgment exceeded the available funds on hand, UNC Health could
look to the state for financial support." (Defs.' MTD Reply
(Doc. 28) at 5.) Because it is not obvious North Carolina would
pay any judgment against UNC-Health, this "first factor strongly
suggests that [UNC-Health] is not an arm of the state." <u>See</u>
<u>Hammons v. Univ. of Md. Med. Sys. Corp.</u>, 551 F. Supp. 3d 567,
586 (D. Md. 2021).

The second factor considers the degree of autonomy UNC-Health exercises, including who appoints UNC-Health's directors or officers, who funds UNC-Health, and whether North Carolina retains a veto over UNC-Health's actions. See U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency, 804 F.3d 646, 668 (4th Cir. 2015). Also relevant is whether UNC "has the ability to contract, sue and be sued, and purchase and sell property, and whether it is represented in legal matters by the state attorney general." Id. "An entity may retain some operational independence in its day-to-day activities, yet still be considered an arm of the state." McAdoo, 248 F. Supp. 3d at 716 (citing Md. Stadium Auth. v. Ellerbe Becket Inc., 407 F.3d 255, 264 (4th Cir. 2005)).

Although UNC-Health retains autonomy in some parts of its operations, the state retains significant participation in and control of UNC-Health's operations, both directly and indirectly. For one, the Board of Governors is significantly involved in and has authority over UNC-Health's affairs.[4] Twelve of the at-large members of UNC-Health's Board of Directors are appointed by the Board of Governors after consultation with the President of UNC-CH. N.C. Gen. Stat. § 116-37(b)(1)(b).

_____

[4] The Board of Governors is an arm of the state responsible for planning and developing a coordinated system of higher education in North Carolina. N.C. Gen. Stat. § 116-11(1).

- 13 -

Additionally, appeals from the Board of Directors' actions are heard by the Board of Governors. See id. § 116-37(b)(4).

The state is also involved in overseeing decisions concerning UNC-Health's officers and employees. UNC-Health's Board of Directors must submit candidates for Chief Executive Officer of UNC-Health "to the President of The University of North Carolina, who if satisfied with the quality of one or more of the candidates, will nominate one as Chief Executive Officer, subject to selection by the Board of Governors." Id. § 116-37(c)(1).[5] While UNC-Health's Board of Directors determines initial employee classifications and pay plans, it must submit those classifications and pay plans to the Office of State Human Resources for review. Id. § 116-37(d).

Although UNC-Health has some discretion in purchasing and entering into contracts, UNC-Health is "subject to the provisions of the State Budget Act." Id. § 116-37(e); see also id. § 116-37(i) (requiring UNC-Health to submit all policies and regulations regarding acquiring and disposing of real property to the State Property Office for review). UNC-Health must submit annual reports to the Joint Legislative Commission on Government

_____

[5] The President of the University of North Carolina is a state employee. Cf. N.C. Gen. Stat. § 116-14.

- 14 -

Operations, which must include actions taken by the Board of Directors. Id. § 116-37(g).

This non-exhaustive list makes clear that although UNC-Health may function similarly to an independent corporate medical system in some respects, "it is nevertheless tethered to State government and subject to State oversight in important ways." Hammons, 551 F. Supp. 3d at 587; see also McAdoo, 248 F. Supp. 3d at 718 ("Despite exercising some level of autonomy in carrying out day-to-day operations, UNC and its constituent institutions remain subject to the control and veto power of the General Assembly."). Therefore, this court concludes that UNC-Health is not autonomous from the State of North Carolina, and the second factor weighs in favor of finding that UNC-Health is an arm or alter ego of the State of North Carolina.

The third factor examines whether the entity is involved with state concerns as distinct from non-state concerns, including local concerns. The North Carolina General Assembly declared that UNC-Health was created "to provide patient care, facilitate the education of physicians and other health care providers, conduct research collaboratively with the health sciences schools of [UNC-CH], and render other services designed to promote the health and well-being of the citizens of North Carolina." N.C. Gen. Stat. § 116-37(a)(1). This language

- 15 -

reflects involvement with statewide concerns, rather than local ones, and thus this factor weighs in favor of finding that UNC-Health is an arm or alter ego of the State of North Carolina. See Hammons, 551 F. Supp. 3d at 586-87 (determining the third Ram Ditta factor weighed in favor of finding University of Maryland's state-run hospital system was an arm of the state where "[t]he Maryland General Assembly declared that [the system] was created to 'provide medical care . . . for the citizens of the State and region,' and that such care 'extend[s] to all citizens of the State . . . .'" (internal citation omitted) (quoting Md. Code Educ. § 13-302(1)-(2))).

The fourth factor, which requires consideration of the treatment of UNC-Health under North Carolina law, points in the same direction. "Although the question of whether an entity is an alter ego of the state is a question of federal, not state, law, the manner in which state law addresses the entity remains 'important, and potentially controlling.'" Md. Stadium Auth., 407 F.3d at 265 (quoting Hall v. Med. Coll. Of Ohio at Toledo, 742 F.2d 299, 304 (6th Cir. 1984)).

This court finds North Carolina law treats UNC-Health as a state agency. The State legislature designated UNC-Health "as an affiliated enterprise of the University of North Carolina." N.C. Gen. Stat. § 116-37(a)(1). Additionally, under North Carolina

law, UNC-Health employees are state employees, id. § 116-37(d),
and UNC-Health is entitled to representation by the Attorney
General of North Carolina, cf. id. § 114-4.2B.

Although North Carolina courts have not ruled on whether
UNC-Health is an agency of the state, federal courts have held
UNC-Health is an arm of the state. See, e.g., Thomas v. North
Carolina, Civil Action No. 3:12-CV-00038-FDW-DCK, 2013 WL
566481, at *7 (W.D.N.C. Feb. 13, 2013) ("Defendants are all
agencies of the State of North Carolina created pursuant to
statute and, therefore, entitled to Eleventh Amendment
immunity."); Solomon v. UNC Healthcare, 5:16-CV-24-FL, 2016 WL
6768920, at *4 (E.D.N.C. Oct. 19, 2016), report and
recommendation adopted, 2016 WL 6683470 (E.D.N.C. Nov. 14,
2016). Although these courts did not specifically address the
Ram Ditta factors, this court is persuaded by these decisions,
especially when considering North Carolina statutes characterize
UNC-Health's employees as state employees and provide for
representation by the Attorney General. Therefore, this court
finds the fourth factor weighs in favor of finding UNC-Health is
an arm of the State of North Carolina.

Plaintiffs argue UNC-Health is like the Maryland National
Capital Park and Planning Commission that the Fourth Circuit in
Ram Ditta determined was not an arm of the state. (Pls.' MTD

- 17 -

Resp. (Doc. 22) at 22–24.) However, UNC-Health is different from the Commission in notable ways. For example, while "it [was] apparent that a judgment against the Commission would not be paid from the state treasury," Ram Ditta, 822 F.2d at 458, it is not so apparent that a judgment against UNC-Health would not be paid from North Carolina's treasury. Counsel for UNC-Health Defendants represented at the hearing that if UNC-Health did not have sufficient funds to cover a judgment, it was his view the state would cover any remaining amount. Even assuming counsel is mistaken, UNC-Health also differs from the Commission because the Commission was operating parks in two of Maryland's counties, id. at 459, whereas UNC-Health is a state-wide medical system, see N.C. Gen. Stat. § 116-37(a), concerned with providing medical care to all North Carolinians. Because UNC-Health differs from the Commission — indeed, the Fourth Circuit held none of the Ram Ditta factors weighed in favor of the Commission — this court finds Plaintiffs' argument unavailing.

Under the foregoing analysis, UNC, UNC-SOM, and UNC-Health are all subject to sovereign immunity. The motion to dismiss will be granted as to these Defendants.

## B.  Individual Defendants

Plaintiffs assert one Section 1983 claim against all Defendants. (Compl. (Doc. 1) ¶¶ 110-33.) The claim seeks relief

- 18 -

against the Individual Defendants in their official and individual capacities. (See, e.g, Compl. (Doc. 1) ¶¶ 120–22.)

Plaintiffs claim they have been injured by: (1) a reduction in their salaries, (2) revocation of their clinical privileges, and (3) reporting of their revocations to the NPDB. (See Pls.' MTD Resp. (Doc. 22) at 20.

Defendants contend Plaintiffs' claim against the Individual Defendants should be dismissed because it is not ripe, the official capacity claims do not seek prospective relief, and the individual capacity claims are barred by qualified immunity.

This court finds that Plaintiffs' claim fails for several reasons. First, Plaintiffs' lack a constitutionally protected interest in their salaries so their salary reductions cannot support a Section 1983 claim. Second, this court evaluates the remaining claims under the ripeness doctrine and determines that the portion of Plaintiffs' claim regarding revocation of their clinical privileges is not ripe, but the portion concerning reporting to the NPDB is ripe. Third, the claims against Individual Defendants in their official capacities fail because Plaintiffs do not state a claim for prospective relief. Finally, the individual capacity claims fail on qualified immunity grounds because the Individual Defendants did not violate a clearly established constitutional right. Therefore, this court

- 19 -

will grant Defendants' motion to dismiss as to the Individual Defendants.

### 1. **Plaintiffs' Salaries**

Defendants argue that Plaintiffs lack a constitutionally protected interest in their administrative titles or full salaries. (Defs.' MTD Br. (Doc. 17) at 20-22.) Plaintiffs do not directly respond to this argument but contend they have been "harmed by the reduction in salary and benefits." (Pls.' MTD Resp. (Doc. 22) at 25.)

This court finds that Plaintiffs do not have a constitutionally protected interest in their administrative titles or their previous salaries, so the deprivation of these benefits cannot support a due process claim under Section 1983.

The Sixth Circuit recognized in Crosby v. University of Kentucky that "tenured university professors do not have a constitutionally protected property interest in administrative posts." 863 F.3d 545, 552 (6th Cir. 2017) (cleaned up). A district court in this circuit has also recognized that "intra-departmental demotions . . . do not implicate property interests subject to the protections of the Due Process Clause." Cominelli v. The Rector & Visitors of The Univ. of Va., 589 F. Supp. 2d 706, 713-14 (W.D. Va. 2008).

Additionally, Plaintiffs have no cognizable interest in their previous salaries. In Henry-Davenport v. School District of Fairfield County, the plaintiff was demoted from the position of Deputy Superintendent of Human Resources to Director of Food Services and received a corresponding salary reduction. 832 F. Supp. 2d 602, 603 (D.S.C. 2011). The district court granted a motion to dismiss the plaintiff's § 1983 procedural due process claim, finding that the "[p]laintiff ha[d] no legal entitlement to the administrative position or salary of Deputy Superintendent . . . . [That] the School District reduced [p]laintiff's administrative salary without affording her a hearing did not violate the Fourteenth Amendment." Id. at 612.

Here, applicable policies reflect the administrative titles and corresponding salaries are not tied to Plaintiffs' tenure, and support reducing Plaintiffs' salaries once they no longer held those administrative roles. (See Doc. 16-1 at 5-6; Doc. 16-3 at 3.)

### 2. Ripeness

Defendants argue Plaintiffs have suffered no injury in fact because the permanent loss of their clinical privileges cannot happen until the conclusion of the administrative appeals process. (Defs.' MTD Br. (Doc. 17) at 17-18.) Defendants further argue Plaintiffs' injury is neither fairly traceable to nor

redressable by Individual Defendants because "Plaintiffs can point to no Individual Defendant and say they alone caused their pending privileges revocation. It is also not clear that any Individual Defendant could redress Plaintiffs' claimed injury." (Id. at 18.)[6] Defendants additionally argue this case is not ripe because "the facts alleged present a prime example of a claimed injury that has not yet occurred and remains contingent upon unknown, future events." (Defs.' MTD Br. (Doc. 17) at 18.)

Plaintiffs argue they have suffered an injury in fact — divesture "of a legally cognizable liberty right" in "their clinical privileges, compensation and benefits, and good name and professional reputation." (Pls.' MTD Resp. (Doc. 22) at 20.) Plaintiffs further argue their injury is traceable to the Individual Defendants and redressable. (Id. at 21.) Additionally, Plaintiffs argue this case is ripe for review because Plaintiffs have alleged they were deprived of their liberty interest when Defendants revoked their privileges without a hearing and published that revocation to the NPDB. (Id. at 19.)

---

[6] Because Defendants argue, correctly, that University Defendants should be dismissed based on sovereign immunity, (see infra Section IV.A), this court will not address whether Plaintiffs' injuries are redressable by those entities. Standing and ripeness are analyzed only as to the Individual Defendants.

Article III of the United States Constitution limits federal courts' jurisdiction "to 'Cases' and 'Controversies.'" Lujan v. Defs. of Wildlife, 504 U.S. 555, 559 (1992). The doctrine of standing delineates "disputes which are appropriately resolved through the judicial process." Id. at 560 (internal quotation mark omitted) (quoting Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)). "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." Id.

Standing has three requirements: "First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not conjectural or hypothetical.'" Id. (internal citations omitted) (quoting Whitmore, 495 U.S. at 155). "A 'concrete' injury must be 'de facto'; that is, it must actually exist." The adjective "concrete" in this context, "convey[s] the usual meaning of the term—'real,' and not 'abstract.'" Spokeo, Inc. v. Robins, 578 U.S. 330, 340 (2016) (internal citation omitted). Second, the injury must be fairly traceable to the defendant's actions, rather than the result of independent action of a third party not before the court. Lujan, 495 U.S. at 560. "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a

- 23 -

favorable decision.'" Id. at 561 (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 38 (1976)).

Like standing, "[t]he doctrine of ripeness prevents judicial consideration of issues until a controversy is presented in 'clean-cut and concrete form.'" Miller v. Brown, 462 F.3d 312, 318-19 (4th Cir. 2006) (quoting Rescue Army v. Mun. Court of L.A., 331 U.S. 549, 584 (1947)). The plaintiff bears the burden of proving ripeness. Id. at 319.

To determine whether the case is ripe, courts "balance 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" Franks v. Ross, 313 F.3d 184, 194 (4th Cir. 2002) (quoting Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 733 (1998)). A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties. See Charter Fed. Sav. Bank v. Office of Thrift Supervision, 976 F.2d 203, 208 (4th Cir. 1992). "The hardship prong is measured by the immediacy of the threat and the burden imposed on the [plaintiffs] who would be compelled to act under threat of enforcement of the challenged law." Id. at 208-09. When considering hardship, courts may consider the cost to the parties of delaying judicial review. Fort Sumter Tours, Inc. v. Andrus, 564 F.2d 1119, 1124 (4th Cir. 1977).

- 24 -

**Plaintiffs' Property Interest in Their**

**Clinical Privileges**

As to the revocation of clinical privileges, Defendants contend Plaintiffs' privileges have not been permanently revoked but only suspended pending final action of the Board of Directors following the hearings Plaintiffs requested. (Defs.' MTD Br. (Doc. 17) at 17–18.) Thus, according to Defendants, Plaintiffs have not been injured because the Board of Directors has not issued its final decision.

Defendants' position on the events as a recommendation of revocation of clinical privileges with an immediate temporary suspension pending final decision accords with the Bylaws and what has transpired in this case. Article VI, Section 1(k) states that "[t]he MSEC may adopt, reject, or modify the recommendations of the Ad Hoc [C]ommittee. . . ." (Bylaws of the Medical Staff University of North Carolina Hospitals ("Bylaws") (Doc. 18-1) at 30.) If MSEC recommends reduction, suspension, or revocation of clinical privileges, "the Medical Staff member is entitled to the rights set forth in Article VII." (Id.) If the member does not choose to exercise those rights, "MSEC's recommendation will go to the Board of Directors for final action." (Id.) The Bylaws also provide that "[a]ny recommendation by MSEC for the reduction, suspension, or

- 25 -

revocation of clinical privileges . . . may become effective immediately if MSEC determines that the failure to act may result in imminent danger to the health of any individual, subject to the reversal by the Board of Directors through the Hearing and Appellate Procedure set forth in Article VII." (Id. (emphasis added).)

It appears Defendants followed the Bylaws. MSEC recommended revocation of Plaintiffs' clinical privileges. (Compl. (Doc. 1) ¶¶ 86-87; March 2022 Email to Nickeleit (Doc. 18-14) at 3; March 2022 Email to Singh (Doc. 18-16) at 3.) That revocation was immediate due to concerns about the health of others. (See March 2022 Email to Nickeleit (Doc. 18-14) at 3; March 2022 Email to Singh (Doc. 18-16) at 3.) However, that revocation is not permanent because it is subject to reversal by the Board of Directors. (Bylaws (Doc. 18-1) at 30.) Final action of the Board of Directors has not yet occurred because the parties are involved in Article VII's Hearing and Appellate Procedure since Plaintiffs' have requested a hearing in accord with their rights under Article VII. (Doc. 18-19; Doc. 18-20; Compl. (Doc. 1) ¶ 94.)

Moreover, while the NPDB reports originally submitted to this court with Plaintiffs' request for a TRO identified the revocations of clinical privileges as permanent, (see Singh NPDB

- 26 -

Report (Doc. 3-9) at 3; Nickeleit NPDB Report (Doc. 3-10) at 3),
Defendants represented to this court in a hearing that "the
communication to the NPDB was an error," (Mem. Op. and Order
(Doc. 36) at 26), and submitted a notice that they have filed a
correction report with the NPDB changing the Length of Action
Field on the form to "Indefinite." (NPDB Amendment Notice (Doc.
31) at 2.) Based on this evidence, this court finds that the
revocation of Plaintiffs' clinical privileges is temporary.
Thus, Plaintiffs cannot demonstrate an injury-in-fact when the
complained of injury — permanent revocation of clinical
privileges — has not occurred.

Additionally, it appears the injuries that Plaintiffs
complain of are not redressable by the Individual Defendants
named in this action. Redressability is "problematic when third
persons not party to the litigation must act in order for an
injury to arise or be cured." Doe v. Va. Dep't of State Police,
713 F.3d 745, 755 (4th Cir. 2013); see also Disability Rights
S.C. v. McMaster, 24 F.4th 893, 903 (4th Cir. 2022) (noting that
an order enjoining the defendants' enforcement of the mask
mandate would not redress the plaintiffs' injuries because the
defendants were not responsible for enforcing the mask mandate,
"so such an order would have no effect on [the defendants']
conduct," and dismissing the action for lack of standing).

An order directing the Individual Defendants to reinstate Plaintiffs' clinical privileges would not redress Plaintiffs' claimed injuries because the Individual Defendants are not authorized to reinstate those privileges. Instead, according to the Bylaws, that power rests with the Board of Directors. (See Bylaws (Doc. 18-1) at 30.) While MSEC can recommend "reduction, suspension, or revocation of clinical privileges," (id.), only the Board of Directors makes a final decision, (id. at 36).

Plaintiffs argue that Dr. Ivester and Dr. Broaddus have the authority to take immediate action under the Bylaws, (see Pls.' MTD Resp. (Doc. 22) at 11); thus, they should also have the power to undo such actions, (id. at 11 n.4). However, MSEC, not Dr. Ivester or Dr. Broaddus, recommended the revocation of Plaintiffs' clinical privileges. (See March 2022 Email to Nickeleit (Doc. 18-14); March 2022 Email to Singh (Doc. 18-16).) A power MSEC holds pursuant to the Bylaws. (See Bylaws (Doc. 18-1) at 30.) It is not evident to this court that Dr. Ivester or Dr. Broaddus would have the authority to override MSEC's decision, particularly where the Bylaws state a decision to revoke clinical privileges by MSEC is only "subject to reversal

by the Board of Directors through the Hearing and Appellate Procedure set forth in Article VII." (Bylaws (Doc. 18-1) at 30.)[7]

Regardless of whether Dr. Broaddus or Dr. Ivester could reinstate Plaintiffs' clinical privileges, this court finds Plaintiffs' claim is not ripe because the "controversy is not final" and is "dependent on future uncertainties." Charter Fed. Sav. Bank, 976 F.2d at 208. The hearing process is ongoing, (see Ivester Decl. (Doc. 18) ¶¶ 21–22), and the only way Plaintiffs' privileges can be permanently revoked such that they have a legally cognizable injury is through a final decision of the

---

[7] Plaintiffs' Response states: "Defendants seemingly argue that all Board of Directors and MSEC members (more than 50 individuals) must be named in this suit to accomplish reinstatement of clinical privileges. Plaintiffs request that this Court allow leave to commence a suit against these individuals." (Pls.' MTD Resp. (Doc. 22) at 10.) The question of whether the injury in question would be traceable if all members of MSEC and the Board of Directors were named in this suit is not before the court and this court expresses no opinion on it. However, to the extent Plaintiffs' statement is a request to amend, it fails to comply with the provisions of Local Rule 7.3 which governs motion practice and will be denied. See L.R. 7.3(a) ("Each motion shall be set out in a separate pleading."); see also L.R. 7.3(j) ("a motion . . . to amend the pleadings . . . must state good cause therefor and cite any applicable rule, statute, or other authority justifying the relief sought. These motions must be accompanied by a proposed order.")

Board of Directors following the Article VII Hearing and Appellate Procedure, which has not yet occurred.[8]

### b. **Plaintiffs' Liberty Interest in Their Professional Reputations**

Plaintiffs do allege an injury-in-fact for the alleged damage to their professional reputations caused by Defendants' disclosure to NPDB. Plaintiffs assert Defendants violated their right to procedural due process under the Fourteenth Amendment by reporting to the NPDB that their clinical privileges were permanently revoked without first affording them a procedure by which to challenge this reporting. (See Pls.' MTD Resp. (Doc. 22) at 19.) Unlike the actual revocation of Plaintiffs' privileges, which has not been completed, the original NPDB report reflected that their privileges had been permanently revoked, (see Singh NPDB Report (Doc. 3-9) at 3; Nickeleit NPDB Report (Doc. 3-10) at 3), and Plaintiffs argue they were not afforded process before that was reported. Though Defendants

_____

[8] Plaintiffs also argue Individual Defendants have violated their rights by refusing to disclose the identities of complaining witnesses. (See Pls.' MTD Resp. (Doc. 22) at 29.) This court finds this claim is not ripe. Plaintiffs have proffered no case law, and this court is aware of none, that holds the identities of witnesses must be disclosed prior to a temporary revocation of clinical privileges. To the extent those witnesses' identities may be necessary for Plaintiffs to adequately defend their cases in their final revocation hearing, that issue is not yet ripe as Plaintiffs' clinical privileges have not been permanently revoked.

appear to have modified the disclosure from permanent to indefinite, (see NPDB Amendment Notice (Doc. 31) at 2), the statements were still published to the NPDB without providing Plaintiffs' an opportunity to contest their accuracy.

The injury to Plaintiffs' professional reputations is thus not hypothetical, and it is sufficiently concrete for a federal court to address. See Doe, 713 F.3d at 757 (holding the plaintiff had demonstrated an injury where the defendant had reclassified her as a sex offender and published that status to a national registry without affording the plaintiff any process).

Further, Plaintiffs can demonstrate traceability and redressability. Plaintiffs allege "[t]he Defendants reported the immediate termination of privileges to the [NPDB] . . . on March 16, 2022." (Compl. (Doc. 1) ¶ 89.) Thus, Plaintiffs' reputational injury is directly traceable to the Defendants who reported to the NPDB. Although it is unclear which Individual Defendants reported the revocation to the NPDB, (see Compl. (Doc. 1) ¶ 102 ("Defendants, individually and collectively, report[ed] to [the NPDB]")), Defendants have not challenged that the permanent revocation was reported. Because "the injury complained of is the [NPDB disclosure] itself," Plaintiffs "meet[] the requirements of traceability and redressability,

- 31 -

because [they] have already been reclassified and [are] afforded no procedure by which to challenge [their] reclassification." <u>Doe</u>, 713 F.3d at 757.

Additionally, Plaintiffs' procedural due process claim as to their liberty interest is ripe. Plaintiffs have already been classified with the NPDB as having their privileges permanently revoked and that classification has been publicized on the NPDB. Accordingly, "the injury [they] allege[] has already occurred and is not merely speculative." <u>Doe</u>, 713 F.3d at 759.

In sum, Plaintiffs' procedural due process claim as to their property interest in their clinical privileges is not yet ripe for judicial review, but their claim regarding their liberty interest in their reputation is ripe.

### 3. <u>Official Capacity Claims</u>

Defendants also argue that the claims against the Individual Defendants in their official capacities should be dismissed because they fail to state a claim for prospective relief from an ongoing violation. (Defs.' MTD Br. (Doc. 17) at 14–16.) Plaintiffs' contend a "due process violation is ongoing" because they are "still licensed physicians and tenured professors at UNC-SOM but cannot perform any clinical work. . . ." (Pls.' MTD Resp. (Doc. 22) at 25.) This court agrees with

Defendants that Plaintiffs have failed to state a claim for prospective relief.

The Supreme Court has held "that neither a State nor its officials acting in their official capacities are 'persons' under § 1983," where the plaintiff seeks monetary damages. Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989). Under Will, the claim for monetary damages against the Individual Defendants acting in their official capacities must be dismissed.

But when a plaintiff seeks injunctive relief, then the state official acting in an official capacity is a person under § 1983, Will, 491 U.S. at 71 n.10, and "official-capacity actions for prospective relief are not treated as actions against the State," Kentucky v. Graham, 473 U.S. 159, 167 n.14 (1985) (citing Ex parte Young, 209 U.S. 123 (1908)). "Under Ex parte Young, private citizens may sue state officials in their official capacities in federal court to obtain prospective relief from ongoing violations of federal law." Allen v. Cooper, 895 F.3d 337, 354 (4th Cir. 2018). The plaintiff bears the burden "to establish an ongoing violation of federal law to qualify for relief under Ex parte Young." Id. at 355. The Fourth Circuit "has held that this exception 'does not apply when the alleged violation of federal law occurred entirely in the

- 33 -

past.'" <u>Wicomico Nursing Home v. Padilla</u>, 910 F.3d 739, 747 (4th
Cir. 2018) (quoting <u>DeBauche v. Trani</u>, 191 F.3d 499, 505 (4th
Cir. 1999)).

Put another way, the <u>Ex parte Young</u> exception applies if
"(1) the violation for which relief is sought is an ongoing one,
and (2) the relief sought is only prospective." <u>Republic of
Paraguay v. Allen</u>, 134 F.3d 622, 627 (4th Cir. 1998). "In
determining whether the doctrine of <u>Ex parte Young</u> avoids an
Eleventh Amendment bar to suit, a court need only conduct a
'straightforward inquiry into whether [the] complaint alleges an
ongoing violation of federal law and seeks relief properly
characterized as prospective." <u>Verizon Md., Inc. v. Pub. Serv.
Comm'n of Md.</u>, 535 U.S. 635, 645 (2002) (quoting <u>Idaho v. Couer
d'Alene Tribe of Ida.</u>, 521 U.S. 261, 296 (1977)).

Plaintiffs claim they "seek prospective relief against all
Defendants in the form of reinstatement and an injunction
against Defendants making further statements or taking further
action to injure their reputations." (Compl. (Doc. 1) ¶ 120.)
Put another way, they seek prospective relief that would
(1) reverse the permanent revocation of their clinical
privileges and (2) prevent Defendants from making disclosures to
the NPDB. (<u>See</u> <u>id.</u>) However, neither of these arguments properly
state a claim for prospective relief.

- 34 -

The question of whether this court should reverse the
permanent revocation of Plaintiffs' clinical privileges is not
ripe, as Plaintiffs' clinical privileges have not been
permanently revoked. (See supra Section IV.B.2.a.) Additionally,
this court has previously addressed why Plaintiffs' request that
Defendants be enjoined from further publication to the NPDB
fails under an Ex parte Young analysis. (See Mem. Op. and Order
(Doc. 36) at 23–26.) No new evidence or argument has been
presented to this court that would undermine its prior analysis.
This court will therefore restate why Plaintiffs have not made a
proper request for relief from an ongoing violation of federal
rights.[9]

Plaintiffs have alleged their procedural due process rights
were violated when Defendants reported to the NPDB that
Plaintiffs' clinical privileges were permanently revoked. (See
Compl. (Doc. 1) ¶ 130.) However, following the hearing before

_____

[9] The following analysis is limited to UNC-Health employees
Dr. Ivester and Hadar. Defendants separately conceded "that
Defendants Voss, Hoar and Lineberry do not have sufficient
authority to reinstate Plaintiffs clinical privileges and do not
oppose the dismissal of suit against Defendants Voss, Hoar and
Lineberry in their official capacities." (Pls.' MTD Resp. (Doc.
22) at 27 n.12.) This leaves the claim against Dr. Broaddus
unresolved. However, as Dr. Broaddus is employed by UNC-SOM, not
UNC-Health, (see Compl. (Doc. 1) ¶ 2), there is no evidence he
has control over reporting to the NPDB and therefore the claim
of prospective relief to prevent future communications from
Dr. Broaddus to the NPDB cannot be maintained.

this court, during which UNC-Health Defendants' counsel advised
this court that the communication to the NPDB was erroneous in
that it communicated that Plaintiffs' privileges had been
permanently revoked when that had not occurred, UNC-Health
Defendants filed a Notice informing this court that "[o]n May
10, 2022, UNC Hospitals submitted a correction report to the
NPDB changing the entry in the 'Length of Action' field from
'Permanent' to 'Indefinite.'" (NPDB Amendment Notice (Doc. 31)
at 3.)

Plaintiffs responded to the Notice, (see Pls.' Resp. to
Notice (Doc. 32)), and argue that "Defendants' change in 'Length
of Action' is insufficient to remedy the due process violation
that triggered this lawsuit," (id. ¶ 1). Plaintiffs contend the
"use of the term 'revocation' conflicts with [Defendants']
position during oral argument." (Id. ¶ 3.) Additionally,
Plaintiffs take issue with the representation on the NPDB report
"that the alleged misconduct affected 'clinical care.'" (Id. ¶
4.)

This court finds Plaintiffs' argument unpersuasive.
Regardless of whether the status of Plaintiffs' clinical
privileges is labeled a revocation or suspension, the status is
not permanent until the Board of Directors meets and makes a
final determination. (See Bylaws (Doc. 18-1) at 30-31.) Under

- 36 -

the Bylaws, only the Board of Directors can make a permanent change to Plaintiffs' clinical privileges. (Id.)

This court further finds that the fact the NPDB report indicates Plaintiffs' alleged conduct affected clinical care is not "expressly refut[ed]" by Defendants' HR investigation, contrary to Plaintiffs' argument. (See Pls.' Resp. to Notice (Doc. 32) ¶ 4.) For one, the term "clinical care" is broad and by its ordinary meaning encompasses more than just patient care. Dr. Ivester's letters to Plaintiffs explaining MSEC's recommendation said that the HR Report and MSEC's Ad Hoc committee report "document patterns of unprofessional conduct deemed to be detrimental to patient care and disruptive to the care environment." (See, e.g., Doc. 18-14 at 2 (emphasis added).) More importantly, Plaintiffs have failed to explain why it was inappropriate for MSEC to consider the allegations related to patient care. Plaintiffs quibble with the semantics of the report to the NPDB but have failed to explain how it contains patently false information.

As a result of UNC-Health's voluntary actions in amending the notice to the NPDB, Plaintiffs' liberty interest claim, which was initially ripe, is now moot. Like the defendants in Allen, UNC-Health Defendants have provided reasonable assurances to this court that it will not communicate erroneous information

- 37 -

in the future to the NPDB. This court has considered whether the voluntary cessation exception to mootness applies, and under these circumstances, it does not appear to this court that the exception applies. Having represented to this court that the communication to the NPDB was an error when Plaintiffs' privileges have not yet been permanently revoked, it is difficult to conceive UNC-Health Defendants would repeat that conduct in the future. See Allen, 895 F.3d at 355 (reasoning that it was the plaintiffs' burden to establish an ongoing violation of federal law to qualify for relief under Ex parte Young, and because the ongoing challenged actions had ended, the plaintiffs could not sue the defendants in their official capacities). As a result, Defendants' motion to dismiss will be granted as to the Individual Defendants.

### 4.   Individual Capacity Claims

Plaintiffs assert the Individual Defendants are liable in their individual capacities for permanently revoking Plaintiffs' clinical privileges without a hearing and publishing erroneous information harmful to Plaintiffs' professional reputations without providing Plaintiffs' a pre-publication hearing. (Pls.' MTD Resp. (Doc. 22) at 27–29.)

"Qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established

- 38 -

statutory or constitutional rights of which a reasonable person would have known." <u>Allen</u>, 895 F.3d at 456 (cleaned up).

> A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he [or she] is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate. . . .
>
>        . . . .
>
> . . . The Supreme Court has repeatedly told courts . . . not to define clearly established law at a high level of generality. Thus, we consider whether a right is clearly established in light of the specific context of the case, not as a broad general proposition.

<u>Adams v. Ferguson</u>, 884 F.3d 219, 226–27 (4th Cir. 2018) (quotation marks and citations omitted). The "qualified immunity analysis typically involves two inquiries: (1) whether the plaintiff has established the violation of a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." <u>Raub v. Campbell</u>, 785 F.3d 876, 881 (4th Cir. 2015).

A clearly established right is one that is "sufficiently clear [such] that every reasonable official would [have understood] that what he is doing violates that right." <u>Reichle v. Howards</u>, 566 U.S. 658, 664 (2012) (cleaned up). Importantly, the "clearly established" inquiry "must be undertaken in light of the specific context of the case, not as a broad general

- 39 -

proposition." <u>Mullenix v. Luna</u>, 577 U.S. 7, 12 (2015) (citation and internal quotation marks omitted); <u>see also</u> <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 742 (2011) (stating that courts must not "define clearly established law at a high level of generality"). There need not be a case "directly on point" in order for an official to know that his or her conduct violates a clearly established right, "but existing precedent must have placed the statutory or constitutional question beyond debate." <u>Crouse v. Town of Moncks Corner</u>, 848 F.3d 576, 583 (4th Cir. 2017) (quoting <u>al-Kidd</u>, 563 U.S. at 741); <u>see also</u> <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987) ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." (citation omitted)).

### a. <u>Right to a Hearing Before Temporary Revocation of Clinical Privileges</u>

This court has already concluded that the revocation of Plaintiffs' clinical privileges is temporary and not permanent pending a final decision by the Board of Directors. (<u>See</u> <u>supra</u> Section IV.B.2.a.) Additionally, Defendants are entitled to qualified immunity on this claim because Plaintiffs cannot

establish the temporary revocation of their clinical privileges violates a clearly established constitutional right.

Defendants argue that, assuming Plaintiffs have established a right to a hearing before temporary suspension of Plaintiffs' clinical privileges, that right is not clearly established. (Defs.' MTD Br. (Doc. 17) at 24.) Defendants also contend they "acted reasonably in following UNC-CH's policies when reducing Plaintiffs' salaries and revoking their titles." (Id. (citing Mullenix, 577 U.S. at 11).) Plaintiffs, on the other hand, argue the right to a hearing before terminating a physician's hospital privileges is a clearly established right such that Individual Defendants are not immune from suit in their individual capacities. (Pls.' MTD Resp. (Doc. 22) at 28.)

Case law supports Defendants' argument that Plaintiffs do not have a procedural due process right in a hearing before temporary suspension of their clinical privileges. In Moore v. Williamsburg Regional Hospital, the plaintiff-doctor's medical privileges were immediately suspended based on allegations of sexual abuse of a minor child. 560 F.3d 166, 169 (4th Cir. 2009). The plaintiff was provided a notice similar to the notice provided to Plaintiffs in this case:

> In a letter dated September 13, 2004, Juberg notified plaintiff that his privileges were summarily suspended pursuant to the hospital's Medical Staff Bylaws provisions for corrective action. Juberg explained

- 41 -

that "[b]ased upon serious allegations of sexual
misconduct of a minor child . . . the Medical Staff
and [WRH] believe that the best interest of patient
care and welfare is served by an immediate summary
suspension of your clinical staff privileges." Juberg
also notified plaintiff that the MEC would review his
summary suspension that evening and invited him to
present his case, although he would not be allowed to
vote on the matter.

Id. The MEC voted to continue the plaintiff's suspension and

"inform[ed] plaintiff of his right to have the decision reviewed

in a hearing with representation by counsel pursuant to Article

VIII of the hospital's bylaws." Id. While the plaintiff was

eventually provided with notice of the charges against him,

ample opportunity to present evidence, and the ability to call

and cross-examine witnesses before his privileges were

permanently revoked, he received minimal process before his

privileges were temporarily revoked — it appears he was merely

given a letter saying the decision had been made. See id. at

169, 180. The Fourth Circuit held that the plaintiff's

procedural due process claim failed because the procedures

afford to the plaintiff "exceed the constitutional threshold

established by Matthews v. Eldridge, 424 U.S. 319 (1976)." Id.

at 180; see also Everett v. Franciscan Sisters Healthcare, Inc.,

882 F.2d 1383, 1387 (8th Cir. 1989) ("Case law supports summary

suspension without hearing when adequate standards exist in the

- 42 -

bylaws, those standards are met <u>and</u> a post suspension hearing is afforded.") (emphasis in original).

The facts of <u>Moore</u> resemble the facts of the instant case. Like the doctor in <u>Moore</u>, Plaintiffs' clinical privileges were immediately suspended pending a formal hearing. (March 2022 Email to Nickeleit (Doc. 18-14); March 2022 Email to Singh (Doc. 18-16).) Plaintiffs have also elected to have hearings like the plaintiff in <u>Moore</u>. (Docs. 18-25, 18-26.)

This court need not resolve whether Defendants' temporary suspension before a hearing on final revocation violates procedural due process to resolve the issue of qualified immunity. <u>See</u> <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009) ("Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right.") All that must be determined is whether reasonable officials would have understood beyond debate they were violating Plaintiffs' procedural due process rights. <u>Reichle</u>, 566 U.S. at 664. In this case, reasonable officials would not have understood beyond debate that they were violating Plaintiffs' procedural due process rights in temporarily suspending their clinical privileges because the Bylaws expressly allowed that to occur. (Bylaws (Doc. 18-1) at 30.) Further, Fourth Circuit case law, like <u>Moore</u>, indicates Plaintiffs do not have a "clearly

- 43 -

established" right in a pre-suspension hearing. Because
reasonable officials in Defendants' position would not have
understood beyond debate that their actions violated Plaintiffs'
procedural due process rights, a clearly established right was
not violated. See Allen, 895 F.3d at 357 (holding that qualified
immunity prevented suing the defendants in their individual
capacities where it was not understood beyond debate that the
defendant's publication of the material violated the plaintiff's
rights under the Copyright Act).

   b.   **Right to a Hearing Before Disseminating**
        **Information to NPDB**

     Plaintiffs argue that it is clearly established that
disclosing information concerning their suspension without a
hearing violates the Due Process Clause. (Pls.' MTD Resp.
(Doc. 22) at 27 (citing Cannon v. Village of Bald Head Island
N.C., 891 F.3d 489, 506 (4th Cir. 2018)).) This court disagrees.

     When a person's name, reputation, honor, or integrity is in
jeopardy because of action taken by the government, due process
is imperative. See Cannon, 891 F.3d at 501 (quoting Sciolino v.
City of Newport News, 480 F.3d 642, 646 (4th Cir. 2007)).
"Accordingly, as to public employees, a Fourteenth Amendment
liberty interest is implicated by public announcement of reasons

for an employee's discharge." Id. (internal quotation marks omitted) (quoting Sciolino, 480 F.3d at 645-46).

However, where the announcement at issue is a disclosure to the NPDB, courts have found that an employee is not deprived of a constitutionally protected liberty interest where that report harms their reputation. Randall v. United States, 30 F.3d 518, 522 (4th Cir. 1994); see also Brown v. Med. Coll. of Ohio, 79 F. Supp. 2d 840, 846 (N.D. Ohio 1999) ("Every court to have addressed the issue has held that a wrongful report to the NPDB does not constitute a deprivation of a liberty or property interest that is protected by federal law."); Draghi v. Cnty. of Cook, 991 F. Supp. 1055, 1059 (N.D. Ill. 1998) (holding that a report to the NPDB concerning termination of the plaintiff's employment and hospital privileges did not constitute a deprivation of a constitutionally protected right).

In Randall, the Fourth Circuit held that a former Army physician was not deprived of a liberty interest when her former employer made an adverse action report with the NPDB. 30 F.3d at 518. The court held this failed to "rise to the level of a constitutional deprivation." (Id.)

Again, this court need not resolve whether Defendants' report to the NPDB violates procedural due process to resolve the issue of qualified immunity. See Pearson v. Callahan, 555

U.S. 223, 231 (2009). All that must be determined is whether reasonable officials would have understood beyond debate they were violating Plaintiffs' procedural due process rights by making a report to the NPDB without first giving Plaintiffs an opportunity to be heard regarding the disclosure. In this case, reasonable officials would not have understood beyond debate they were violating Plaintiffs' procedural due process rights by reporting adverse information to the NPDB because the Fourth Circuit has held such reports do not implicate constitutionally protected rights. See Randall, 30 F.3d 518. Because reasonable officials in Defendants' position would not have understood beyond debate that their actions violated Plaintiffs' procedural due process rights, a clearly established right was not violated.

Therefore, Defendants are entitled to qualified immunity on Plaintiffs' property interest claim in their clinical privileges and their liberty interest claim in the report to the NPDB. The claim against the Individual Defendants in their individual capacities shall be dismissed.

## V.   <u>CONCLUSION</u>

This court finds that the University Defendants UNC-CH, UNC-SOM, and UNC-Health are immune from suit based on sovereign immunity, therefore the motion to dismiss should be granted as to

them. Additionally, the claims against the Individual Defendants fail because, <u>inter alia</u>: (1) Plaintiffs' lack a legally cognizable interest in their salaries, (2) Plaintiffs' claim regarding the temporary suspension of their clinical privileges is not ripe, (3) Plaintiffs' fail to state a claim for prospective relief regarding the temporary suspension of their clinical privileges, and (3) Defendants are entitled to qualified immunity for the suspension of Plaintiffs' clinical privileges and the reporting to the NPDB.

For the foregoing reasons,

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss Pursuant to Rule 12(b)(1), (Doc. 16), is **GRANTED**, and this action is hereby **DISMISSED WITHOUT PREJUDICE.**

This the 2nd day of March, 2023.

_____
United States District Judge

- 47 -